Hall v. Otterson.

SARAH M. HALL

v.

ANDREW OTTERSON et al.

1. Where a wife and her husband, who was a lawyer, executed a deed of trust of her separate property by which he acquired an advantage, the burden is on him to show that she thoroughly understood its effect, and where it does not appear that she had independent advice, and the deed was complicated, and a cursory reading of it would disclose the scheme of the wife to have been that if neither wife nor husband disposed of the property by will, it should go to the heirs-at-law of the wife; and such reading would not give the unprofessional mind an idea that, by the words "or the survivor of them" in the power of revocation, it gave the husband power, on the wife's death, to have the fee vested in him and diverted from her heirs; it is not to be presumed that she understood its effect from the fact that the acknowledging officer has certified that he made known its contents to her. When a power of revocation in such deed is limited in its exercise to the joint action of the husband and wife, the inference is strengthened that the deed was executed by the wife without thoroughly understanding its effect and under a mistake. When these elements exist such a deed will not be allowed to stand against the heirs of the wife, both she and her husband having died without disposing of the property by will, and he having after her death revoked the trusts and had the fee vested in him.

2. A suit to set aside a deed of trust by reason of mistake, being purely of equitable cognizance, is not affected by the statute of limitations.

3. A suit by the heir of a married woman to set aside a deed of trust of her separate property by reason of a mistake, which gave the husband power after her death to have the fee vested in him and diverted from her heirs, is not barred by acquiescence and laches, except as to such part of the property as

he has sold to *bona fide* purchasers, where the husband was entitled to the possession of the property for life by the curtesy, and the heir lived with and trusted the husband, and he told her that his wife had given him the property, and promised her that, if she outlived him, she would see that he had done her no wrong, and she brought the suit three months after his death.

On bill, answer, replication and proofs in open court.

*Mr. Barker Gummere* and *Mr. William S. Gummere*, for the complainant.

*Mr. Peter V. Voorhees* and *Mr. Frank T. Lloyd* (of the Philadelphia bar), for the defendants.

GREEN, V. C.

Samuel Haines, late of the county of Burlington, in this state, who departed this life about the year 1835, was seized in his lifetime and at his death of a considerable estate, including a farm at Moorestown, N. J., being the lands and premises in controversy in this suit. He left him surviving his widow, since deceased, and two daughters, Rebecca B. and Sarah M., his only children and heirs-at-law. Sarah M. Haines, on or about the 9th of June, 1849, conveyed all her undivided one-half part in the premises in controversy to one John M. Kaighn, his heirs and assigns, in trust, among other things, to convey all or any part thereof whenever the said Sarah M. Haines, whether *feme covert* or *feme sole*, should, in a specified manner, direct.

Sarah M. Haines, on or about the 27th day of June, 1849, intermarried with one Samuel W. Hall, and on August 31st, 1852, together with her husband, conveyed all her equal undivided one-half part of the premises to her sister, Rebecca B. Haines, and afterwards, on or about the 5th of December, 1857, John M. Kaighn, trustee as aforesaid, by direction of the said Sarah M. Haines, granted, ratified and confirmed the aforesaid conveyance of the said undivided half in and to the said Rebecca B. Haines, who, by reason of the said conveyances and her inheritance from her father, became the sole owner in fee of the premises.

On or about the 1st of October, 1856, Rebecca B. Haines intermarried with one James Otterson, Jr., and on March 2d, 1858, a child was born of the marriage. It lived only twenty-seven days. James Otterson, Jr., was a lawyer of prominence in Philadelphia, and, as the evidence shows, was entrusted by his wife with the entire management of her property and affairs.

February 25th, 1856—that is, six days before the birth of the child—Otterson and his wife, for a nominal consideration, executed a deed conveying the premises in controversy to James E. Gowen on various trusts.

Mrs. Otterson had considerable other property, real and personal, and I do not think the provisions of the trust deed, other than the clause claimed to contain a power of revocation, are justly open to severe criticism as unreasonable or improvident. It is true that by them the husband acquired control of the wife's estate during his life, but that is no more than would be expected from a loving and devoted wife to an affectionate and attentive husband. By the insertion, however, in the clause referred to of the words " or survivor of them," he was enabled to defeat what I think appears to have been the intention of his wife, namely, that the property should, in the event which has happened, descend to those in whose behalf this suit is brought. After the trust, as to the property during the lives of both husband and wife, there follow provisions, which, stripped of their technical phraseology, substantially provide that the wife, at any time during her life, might appoint to whom all or any part of the premises should go after her decease and the decease of her husband; that if she should not by will so appoint, then he, at'any time during his natural life, might by will dispose of the premises to whomsoever he might choose; and if neither of them should dispose of the premises *by will,* then the trustee should hold the farm for the right heirs-at-law of Rebecca, and by good conveyance convey the premises to the said right heirs of Rebecca in fee, in such shares and proportions as the said heirs would have been entitled to had Rebecca died intestate.

Then follows the clause providing for the revocation of the uses and trusts declared in the deed and for reconveyance, but

which revocation could only be made by James Otterson, Jr., and Rebecca jointly, during their lives, and by the survivor of them, with the proviso that Otterson, in the event of his surviving his wife, was not to have power to defeat any testamentary devise or appointment which Rebecca might make in her lifetime.

Mrs. Otterson died March 10th, 1863, intestate, leaving her husband, but no issue, her surviving, and the complainant, Sarah M. Hall, her only sister and sole heir-at-law.

James Otterson, Jr., the husband, took possession of the farm and continued to occupy it until his death, September 24th, 1890. The deed of trust was not recorded until January 22d, 1864, six years after its date and one year after Mrs. Otterson's death. Between the time of Mrs. Otterson's death and the record of the deed, Gowen, the trustee, on Otterson's revocation of the trust and demand therefor, made a deed in fee of the premises to James Otterson, Jr., and on February 16th, 1885, Gowen died. The deed from Gowen to Otterson was also recorded January 22d, 1864.

Otterson, in his lifetime, conveyed several portions of the property to various individuals, many of whom erected buildings on the parcels so conveyed.

On Otterson's death a paper was found, signed by him, but not in the presence of witnesses, so as to be effectual as a will under the statute, by which he attempted to devise the farm in question to the children of the complainant. In consequence of its defective execution, he died intestate as to the real estate, leaving no issue, but several brothers and sisters his only heirs-at-law, who thereupon took possession of the property, and afterwards, by deed dated November 13th, 1890, conveyed the premises to Charles H. Otterson in trust, which deed, it seems to be admitted, was made for convenience in making title to the lands.

Sarah M. Hall, the complainant and sole heir-at-law of Rebecca B. Otterson, brought an action of ejectment three months after Otterson's death, and on the 10th of January, 1891, filed the bill in this cause to set aside the deed of trust.

Otterson died insolvent, so much so that the value of this land is necessary to pay his debts, and the contest in the case is therefore practically between the complainant, as the heir-at-law of Mrs. Otterson, and the creditors of James Otterson, Jr.

The deed in question was made prior to the birth of the child and subsequent to the Married Woman's act of 1852. *Nix. Dig. (4th ed.) 547.*

This deed was a voluntary conveyance on the part of Mrs. Otterson. She had inherited the property in question from her father, who died in 1835, when she was three years of age. She held it and the rents, issues and profits thereof after her marriage in 1856, under the act of 1852, "as her sole and separate property, as if she was a single female." At the time of the conveyance attacked her husband had no present estate in her lands.

He was not tenant by the curtesy initiate, not only because the act of 1852 prevented his acquisition of that estate (*Porch v. Fries, 3 C. E. Gr. 204*), but also because no issue of the marriage had yet been born alive, nor, for the same reason, had he "obtained an inchoate right which, on his wife's death, he surviving, would bloom into a freehold." *Insurance Co.* v. *Barracliff, 16 Vr. 543, 550.*

In *Shurmur* v. *Sedgwick, 24 Ch. Div. 597,* Vice-Chancellor Bacon held that the relinquishment of a possible estate by the curtesy did not render a deed of settlement voluntary and void as against a mortgage under *27 Eliz. c. 4 § 1.*

*Speakman* v. *Tatem, 3 Dick. Ch. Rep. 136; affirmed on appeal, 5 Dick. Ch. Rep. 484,* recognizes that the husband has some inherent marital rights in his wife's estate, which are not defined, which he may relinquish in a deed of settlement, of sufficient moment to give him the right to hold the trustee to the discharge of his duty.

But in this case any such interests were not given up by Mr. Otterson, who, by the terms of the trusts, secured for his life every right in his wife's property which he could possibly have exercised over it as her husband.

The rule of equity that "he who bargains in a matter of advantage with a person placing confidence in him, is bound to

show that a reasonable use has been made of that confidence" (*Gibson* v. *Jeyes, 6 Ves. 266*), applies with peculiar force to a transaction by which a husband secures from his wife a portion of her estate. The most dominant of all relations is that of the husband over the wife. There are, of course, exceptional cases when the will of the woman may control. The relation is so close, the trust of the wife so absolute, her dependence so entire, it may be her fear so abject, while the dominion of the husband is so complete, his influence so insidious yet so controlling, that equity regards all such transactions with a jealous care and subjects them to the severest scrutiny. The greater the affection the more submissive the dependence, the stronger the trust the more liable is the wife to be subject to the control of the husband, and the more vigilant should the court be in protecting the weak. *Farmer, Executor,* v. *Farmer, 12 Stew. Eq. 211, 216;* *May Fraud. Conv.* (*T. B. S.*) *483;* *Black* v. *Black, 3 Stew. Eq. 215, 219;* *Boyd* v. *De La Montagnie, 73 N. Y. 502;* *Weeks* v. *Haas, 3 Wils. & S. 520;* *Campbell's Appeal, 80 Pa. St. 298;* *Darlington's Appeal, 86 Pa. St. 512;* *McRae* v. *Battle, 69 N. C. 98;* *Witbeck* v. *Witbeck, 25 Mich. 439;* *Smyley* v. *Rees, 53 Ala. 89;* *Shaffer* v. *Kugler, 107 Mo. 58.* Chief-Justice Gibson says, in *Watson* v. *Mercer, 6 Serg. & R. 49,* with reference to transfers obtained from the wife for the purpose of vesting the estate in the husband: "What honest mind would feel regret that, in the hurry of accomplishment, some circumstance, merely formal, was omitted by which the wife and her family were rescued from his rapacity?"

This deed was executed at a critical period of Mrs. Otterson's life; she was in extremely delicate health; it was doubtful if she would survive the peril of her approaching confinement. She was a refined lady, unacquainted with business, relying for its care first on her agents and then on her husband, who, after their marriage, became her agent and was entrusted by her with the entire management of her estate and exclusively of the property in question; in short, she was most dependent on him and devoted to his interests; her affection for and attention to him were marked, as was her anxiety to please him. He was

a prominent lawyer; so was the selected trustee, who was the husband's intimate friend, and was also the officer who took the acknowledgment. So far as the evidence shows, this inexperienced lady, without any competent independent adviser, was surrounded by these gentlemen, of whose legal ability she must have been aware, and in one of whom she reposed the most implicit confidence. It is a case in which the court should be alert to require the observance of all the technical rules applicable.

In all transactions between persons occupying relations, whether legal, natural or conventional in their origin, in which confidence is naturally inspired, is presumed, or in fact reasonably exists, the burden of proof is thrown upon the person in whom the confidence is reposed and who has acquired an advantage, to show affirmatively, not only that no deception was practiced therein, no undue influence used, and that all was fair, open and voluntary, but that it was *well understood.* *Mott* v. *Mott, 4 Dick. Ch. Rep. 192; Gibson* v. *Jeves, supra; Hoghton* v. *Hoghton, 15 Beav. 278; Simeon* v. *Wilson, 3 Edw. Ch. 36; Coutts* v. *Acworth, L. R. 8 Eq. 558; Boyd* v. *De La Montagnie, supra; Darlington's Appeal, supra; Hugenin* v. *Baseley, 2 White & T. Lead. Cas. (T. B. S.) 597 and notes.*

It is essential to the maintenance of a deed of gift that the donor comprehends the full force and effect of his acts, as Sir George Jessel puts it, "thoroughly understands what he is about" (*Dutton* v. *Thompson, 23 Ch. Div. 278, 281*); or, in the words of Lord Eldon, in *Hugenin* v. *Baseley, 14 Ves. 273*, "with that knowledge of all their effect, nature and consequences, which the defendants and the attorney were bound by their duty to communicate to her, before she was suffered to execute them." See, also, *Mulock* v. *Mulock, 4 Stew. Eq. 594, 602.* It is to establish this thorough understanding that the burden of proof is thrown on the donee in cases of gifts between persons standing in fiduciary relations.

The state, in its careful protection of the rights of a married woman in the transfer of her real estate, requires by statute that a public officer shall make known to her the contents of the

Hall v. Otterson.

instrument, and take her acknowledgment, when she is separate and apart from her husband, that her execution thereof is her voluntary act and deed, freely done and without any fear, threats or compulsion of her husband. This law is to secure to her, through an officer, knowledge of the contents of the paper and an opportunity, when not in the actual presence of her husband, of exercising her own will and purpose. The certificate of the officer, in compliance with the statute, completes the formality and makes it a legal conveyance. It is evidence that the contents of the deed have been made known to the wife, and that she has acknowledged that its execution is free and voluntary. Yet, while it may be true that the deed has been read to her, she may be as far from thoroughly understanding the effect of the act as she may be unconscious of the dominant influence of her husband's will inducing her action.

While, in the case of an ordinary transfer of title, it may be safely assumed that any man or woman of intelligence would entirely comprehend the effect of a deed whose contents have been made known to them, that presumption cannot, I think, be indulged in with reference to a deed of trust with its complicated provisions; something more than having the contents made known would be required in order that a man or woman of ordinary information should fully understand the force and effect of such a deed drawn in the technical verbiage of the professional conveyancer. *Hoghton* v. *Hoghton, supra.*

It is to secure this thorough understanding that courts of equity require, in cases of this kind, except those involving mere trifling gifts, that the donor shall have independent advice. Sir G. J. Turner, L. J., in *Rhodes* v. *Bate, L. R. 1 Ch. App. 252* (at *p. 257*), says: " I take it to be a well-established principle of this court that persons standing in a confidential relation towards others cannot entitle themselves to hold benefits which those others may have conferred upon them, unless they can show, to the satisfaction of the court, that the person by whom the benefits have been conferred had competent and independent advice in conferring them. This, in my opinion, is a settled general principle of the court, and I do not think that either the

34

age or capacity of the person conferring the benefit, or the nature of the benefit conferred, affects this principle." Kekewich, J., in *Allcard* v. *Skinner, 36 Ch. Div. 145* (at *p. 158*), says: " Where the paramount influence presumably exists, it [the law] casts on the possessor of such influence the burthen of proving that the gift was .free, and it holds an essential part of that proof to be that the donor had ' competent independent advice;'" and Lindley, L. J., (at *p. 181*): " In this class of cases it has been considered necessary to show that the donor had independent advice, and was removed from the influence of the donee when the gift to him was made." See, also, *Prideaux* v. *Lonsdale, 1 De G., J. & S. 433; Savery* v. *King, 5 H. L. Cas. 627; In re Garnett, 31 Ch. Div. 1; Dolliver* v. *Dolliver, 94 Cal. 642; Leech* v. *Fare,* cited in *13 Am. L. Reg. (N. S.) 350.*

Not only does it not appear that Mrs. Otterson had independent advice to explain the effect of the deed, but I think the present condition of affairs, considered in the light of the provisions of the deed of trust, demonstrates that Mrs. Otterson did not thoroughly understand it. It is undoubtedly true that, in construing an instrument, it is to be assumed that the parties intended its terms in the sense established by the courts in their interpretation, but in ascertaining whether the parties really understood the terms of the instrument, we have a right to judge from its plain provisions whether one or more of its possible effects was intended. No question is raised as to the validity, under the trusts, of the conveyance from James E. Gowen, the trustee, to James Otterson, Jr., by which the fee was vested in him and diverted from the heirs-at-law of Mrs. Otterson. I think a cursory reading of the trusts would never have given the unprofessional mind the idea that any such power was given. The scheme such examination would disclose to such person is that during the lives of James and Rebecca they may *jointly* do what they wish with the property, even to the revocation of the trusts; that Rebecca might at any time during her life appoint to whom all or any part of the premises should go after the death of herself and husband; that in the event of her failure to so appoint, James, he surviving her, at any time during his

life might by will dispose of the premises to whomsoever he might choose; that if neither James nor Rebecca did dispose thereof *by will*, then the trustee should hold for the right heirs of Rebecca, to whom the premises should be conveyed.  It is clear from these provisions that she intended to secure to herself the right to appoint by will the persons to whom she wished the property ultimately to go, and if she failed so to do, that her husband by will might do the same, and in the event of their both dying intestate or without making such appointment, the premises should go to her heirs-at-law.  She died without a will, he made an unfinished attempt to leave one.  The event contemplated, by which the heirs were to have acquired the estate, happened, but the insertion of the words " or the survivor of them," in the clause of revocation, nullified this clearly-expressed intention and tends to divert the property to the creditors of the husband.

The effect of the absence of a power of revocation in a voluntary conveyance has been the subject of much fluctuation of opinion.

Chancellor McGill, in *Van Houghten* v. *Van Winkle, 1 Dick. Ch. Rep. 380* (at *p. 385*), thus states the present condition of the law: "As to such an instrument, the authorities appear to hold that where the intent to make it irrevocable does not appear, and no motive for an irrevocable settlement is shown, the absence of the power of revocation is *prima facie* evidence of mistake." *Garnsey* v. *Mundy, 9 C. E. Gr. 243; S. C., 13 Am. L. Reg. (N. S.) 345*, with note.

The deed in question did contain a certain power of revocation, but it could only be exercised by Mrs. Otterson in the lifetime of her husband by his joint co-operation.  She was the donor and he was the beneficiary in this deed.  Is the reservation of a power to be jointly exercised by the donor and donee such a power of revocation as is contemplated by the authorities?  I do not think it is.

Lord Eldon, in *Hugenin* v. *Baseley, 14 Ves. 296*, referring to a decision of Lord Hardwicke, says: " There was in that deed a power of revocation, but it was a power to revoke in presence

of three persons who perhaps never could be got together, which was therefore considered as if there had been no power of revocation, and the want of such power was considered strong evidence that the parties did not understand the transaction, whence arose a strong inference of an undue purpose."

In this case the reservation of the power of revocation to the donor, to be exercised only jointly with the donee, cannot certainly be considered as reserving to her the right to revoke the deed. The absence of such power under the above statement of the law, then, is *prima facie* evidence of mistake, unless the intent appears to make it irrevocable. So far from this being the case, the insertion of the clause demonstrates that it was the intention to make it revocable, and no motive for an irrevocable settlement is shown.

The evidence shows that this deed by which Mr. Otterson, the agent, secured to himself the opportunity to control and dispose of the property, subject to the single contingency of Mrs. Otterson's power of appointment by will, was entirely voluntary on her part, and that it was made at a time when she was completely under his influence. So far as appears, it was executed by her without any information as to its contents and effect other than what the perfunctory duty of the acknowledging officer required, and without the benefit of independent advice. It would seem from her intention, as gathered from the provisions of the deed, that she did not fully understand its force and effect, and it is to be presumed that it was executed under a mistake, as it is without power of revocation reserved so far as she individually was concerned, although it, on its face, develops the intention that it should be revocable. All these conclusions unite in the result that this deed cannot stand in a court of equity.

It was, however, made in 1858, Mrs. Otterson died in 1863, and the bill was not filed until 1891, twenty-eight years after the execution of the deed, and the defendants set up the statute of limitations and also claim that the complainant, by delay, has lost any right she might otherwise have to attack the conveyances; and further, that by her inaction, with the knowledge that James Otterson, Jr., was exercising acts of ownership

by the sale and conveyance of portions of the estate, and its improvement by the purchasers, she has so far given her acquiescence to the original transaction that she cannot now dissent therefrom in a court of equity.

The sections of the statute of limitations which the defendants rely on are 16 and 17.   *Rev. p. 597.*   The first limits entry on lands to twenty years next after the right of entry accrued ; the other limits the bringing of any real, possessory, ancestral or other action for lands to the same period, after the right or title thereto, or the cause of such action accrues.   The latter relates to actions for the recovery of lands and necessarily involves the possession thereof; the time limited therein cannot commence to run until the right of entry has accrued.   Time, under either section, does not run against a remainderman until the death of the tenant for. life.   This was held in *Pinckney* v. *Burrage, 2 Vr. 21*, with reference to the thirty years' section of the statute. *Rev. p. 598 pl. 24.*   James Otterson, Jr., after the death of his wife, was entitled to the possession of these premises for life as tenant by the curtesy, irrespective of the conveyances.   His possession was as referable to the one right as the other.   While he lived, therefore, Mrs. Hall had neither the right of entry nor of possession.   Until his death in 1890 she could not maintain a suit at law for the recovery of the land, and the statute has not, therefore, run against her at law.   *Duke of Leeds* v. *Amherst, 2 Phil. 117; Kirwin* v. *Kennedy, 3 Ir. Eq. 472; Thompson* v. *Simpson, 1 Dru. & W. 459.*   The principle is also recognized by Lord-Justice Turner in *Life Association* v. *Siddal, 3 De G., F. & J. 58, 72*, saying : "A *cestui que trust* whose interest is reversionary is not bound to assert his title until it comes into possession."

The present suit is one purely of equitable cognizance.   It is founded on that branch of equity jurisdiction which relieves against mistake.   As to its subject-matter, she would be remediless at law.   The case does not fall within the principle that equity applies the bar of the statute to cases where there is both a legal and equitable remedy for the same cause of action. *Kane* v. *Bloodgood, 7 Johns. Ch. 90, 118; Smith, Administra-*

*tor*, v. *Wood, 15 Stew. Eq. 569 ; Kirkpatrick* v. *McElroy, 14. Stew. Eq. 555 ; 13 Am. & Eng. Encycl. L. tit. "Limitation of Actions" p. 675 and notes.*

This defence must rest, therefore, solely on the application of those rules relating to acquiescence and laches, which the court has always recognized, altogether outside and independent of the statute of limitations. They are the fruit of the maxim that "equity aids the vigilant, not those who slumber on their rights." The chancellor has forcibly stated the rule, its reason and the consequences attendant on its disregard in *Van Houten* v. *Van Winkle, supra.*

The defences of laches and acquiescence are cognate but not correlative ; they both spring from the cardinal rule that "he who seeks equity must do equity." Acquiescence, however, properly speaking, relates to inaction during the performance of an act. Laches relates to delay after the act is done.

Lord Cottenham, in *Duke of Leeds* v. *Amherst, supra,* says of the use of the term acquiescence : "If a party, having a right, stands by and sees another dealing with property in a manner inconsistent with that right, and makes no objection while the act is in progress, he cannot afterwards complain. That is the proper sense of the word acquiescence." And thus it is that in such a case an equitable estoppel is raised. Acquiescence here might properly be applied in favor of purchasers, to the inaction of the complainant while James Otterson, Jr., was selling portions of the property and those purchasers were spending money in its improvement.

"But," says Lord-Justice Thesiger, in *De Buesche* v. *Alt, 8 Ch. D. 286, 314,* "when once the act is completed, without any knowledge or assent upon the part of the person whose right is infringed, the matter is to be determined on very different legal considerations. A right of action has then vested in him, which, at all events, as a general rule, cannot be divested without accord and satisfaction or release under seal. Mere submission to the injuries for any time short of the period limited by statute for the enforcement of the right of action cannot take away such

right, although, under the name of laches, it may afford a ground for refusing relief under some peculiar circumstances."

"Now, the doctrine of laches in courts of equity," says Sir Barnes Peacock, in *Lindsay Petroleum Co.* v. *Hurd, L. R. 5 P. C. 221* (at *p. 293*), "is not an arbitrary or technical doctrine. When it would be practically unjust to give a remedy, either because the party has, by his conduct, done that which might fairly be regarded as equivalent to a waiver of it, or when, by his conduct and neglect, he has, though perhaps not waiving that remedy, yet put the other party in a situation in which it would not be reasonable to place him if the remedy were afterwards to be asserted : in either of these cases, lapse of time and delay are most material. But in every case, if an argument against relief, which otherwise would be just, is founded upon mere delay, that delay, of course, not amounting to a bar by any statute of limitation, the validity of that defence must be tried upon principles substantially equitable. Two circumstances, always important in such cases, are the length of the delay and the nature of the acts done during the interval, which might affect either party and cause a balance, of justice or injustice, in taking the one course or the other, so far as relates to the remedy."

In the adjustment of these scales of justice, it is a controlling consideration whether the delay has been without valid excuse—not an excuse in law, but one which would have led a person reasonably to act as the party charged with laches has. A person cannot be deprived of his remedy in equity on the ground of laches, unless it appears that he had knowledge of his rights. As one cannot acquiesce in the performance of an act of which he is ignorant, so one cannot be said to neglect the prosecution of a remedy when he has no knowledge that his rights have been invaded ; excepting always that his want of knowledge is not the result of his own culpable negligence.

It is not a little difficult to determine what knowledge is necessary to place a party in the position of negligently delaying his action.

The chancellor, in *Van Houghten* v. *Van Winkle, supra,* says: "After he has been informed of facts and circumstances which

apprise him of the wrong." The court, in *O'Neill* v. *Hamil, Beat. 618:* "Of her being fully apprised of her rights." In *Lindsay* v. *Hurd, supra,* it is described as " sufficient knowledge of the fact constituting the title to relief." That it must be something more than knowledge of the mere facts which have transpired, or papers which may have been executed, is shown by *In re Garnett, 31 Ch. D. 1,* which was an action brought by two ladies who had themselves executed releases to their aunt. This was done in 1859; the aunt died in 1879; the action was not commenced until 1883 to set aside the releases. The act attacked was the act of themselves, and of course they were not ignorant of it. Lord-Justice Cotton says (at *p. 316*): " But here on the evidence, these ladies never knew until after the death of their aunt that they had any right which they were giving up, any rights beyond those which were stated on the face of that deed, in respect of which they had received those sums."

In *Savary* v. *King, 5 H. L. Cas. 666,* the father had a life estate in certain lands, with remainder to his sons in tail male. He was indebted to S., his solicitor, more than £9,000, which was secured by policies of insurance on his life. In 1835 it was arranged between the father, the solicitor and the eldest son, who had only just come of age, and who was living with his father, that a disentailing deed should be executed, and that the father and son should then execute a mortgage for £10,000, with a power of sale—the difference in the amount of the former encumbrances and mortgage being made up by further advances, there being also a reduction in the rate of interest, and the policies of insurance being assigned to the elder son for his use. The son had no other advice than from his father's solicitor, who was also mortgagee. The father afterwards borrowed more money from the solicitor, repayment of which was secured by charges on the estate executed by both father and son. With part of that money other property was purchased for the son. The original property was afterwards put up for sale to discharge all the encumbrances, and was bought in and ultimately purchased by the solicitor, who was the mortgagee. The bill to set aside these transactions was not filed until 1847, fourteen

years after the disentailing deed was made. It will be noted that in this case the son, who was the plaintiff, participated in the execution of the papers which he sought to set aside, and must therefore have had knowledge of the facts.

Lord-Chancellor Cranworth (at *p. 666*) says, on the question as to the plaintiff being barred by lapse of time: "His bill was filed in March, 1847; that was about twelve years after the date of the mortgage and eight or nine years after the sale. I cannot think that this delay makes any difference in the case. There is no reason whatever to suppose that Richard [the son] was guilty of any unreasonable delay, or indeed of any delay at all, after he had become aware of his right to question the validity of the mortgage; and in those circumstances, even if the delay had been much greater than it was, there would have been nothing to impugn his title to relief. Savary, the solicitor, must be considered substantially to have represented to Richard that the mortgage was valid, and so consequently that the sale was binding on him; he cannot therefore complain that Richard acted on his representations till, after the lapse of several years, he discovered it to be erroneous."

We have here stated as an excuse for delay that the complainant has been misled by the defendant. See, also, *Buckingham v. Ludlum, 10 Stew. Eq. 137, 148.*

Mrs. Hall says that she first heard that her sister, Mrs. Otterson, had executed this deed of conveyance, after her death. That Mr. Otterson then told her that her sister had given him the farm, and that he immediately went on and said, "whoever shall outlive me will see that I have never done you or your children any injustice." She was at the time a member of the Otterson family, making her home with them when her sister died, and continuing to live there for some time thereafter. The same diligence is not required between members of the same family as between strangers. *Laver v. Fielder, 9 Jur. (N. S.) 190.*

After the death of Mrs. Hall's husband, Otterson became her legal adviser, attended to her business and continued, not only on terms of friendship but of confidence with her, during his life. She had every reason to and did put entire trust and reliance in

him and his representations, and there is no reason to think from the facts as they appear, that her confidence was misplaced. The unwitnessed will, dated May 20th, 1887, twenty-four years after his wife's death, demonstrated, I think, that he really intended to carry out Mrs. Otterson's purpose, that this property should go to the children of the complainant.

But it is urged that she had constructive, if not actual, notice from the record of the transfer of the Ottersons to Gowen and from Gowen to Mr. Otterson. The deed of trust, however, was not put upon record until January, 1864, six years after its date, and nearly one year after Mrs. Otterson's death, and cotemporaneous with the conveyance from Gowen, trustee, to Otterson. It does not appear definitely when the statement that his wife had given him the property was made by Otterson to Mrs. Hall, but the fair construction of the evidence is that it was soon after her sister's death. But I do not think she was negligent in failing to make an examination of the record. Not only is it probable that, at the time it was put on record, she was acting under the promises of Otterson, but if she had any knowledge whatever of legal rights she knew that, independent of the deed, Otterson was entitled as tenant by the curtesy to continue in possession of the property.

These defendants stand in Otterson's shoes. They cannot urge, as a bar to the complainant's right of action, a delay in commencing suit, if it has been occasioned by the acts or representations of him under whom they claim. They come into court and insist that it is inequitable that the complainant should, after a delay of many years, prosecute her claim ; but if he whom they represent has been the cause of this procrastination, this appeal to the equitable denial of this court does not lie in their mouths. With his announcement to Mrs. Hall that her sister had given him the farm, he makes her the promise that puts her vigilance to sleep, and it is in consequence of his representations that she has remained inactive ; and herein this case differs from *Wilkinson* v. *Sherman, 18 Stew. Eq. 413.*

It is said that it would be inequitable to permit this suit to be maintained because during the complainant's delay in bringing

it, witnesses have died, and testimony has been lost.  But it appears to me that Mr. Otterson has been himself guilty of laches. in this regard.  He, being a lawyer of distinction, must be assumed to have known that the law cast upon him the burden of proof hereinbefore indicated.  It was within his power, by suit, to have perpetuated the testimony necessary to establish the deed as a valid gift, as well as within hers either to have perpetuated the testimony necessary or to have brought suit to annul it; and he cannot invoke her delay in that regard as a bar to her action because during the interval he has been deprived of testimony lost to him by his own neglect.

I am of opinion that these conveyances, so far as they relate to property not conveyed by James Otterson, Jr., in his lifetime, should be set aside.