This is a bill to cancel a conveyance made by a ward to her guardian at the time of the settlement of his final account shortly after her majority.
The ward in question will be referred to as the complainant, and no mention will be made of her husband in his capacity as a purely formal party. The guardian is the sole defendant. In 1900 the complainant's father died intestate, seized of a parcel of real estate which he had undertaken to devise to his widow. After his death the complainant was born, and the will was nullified by the twentieth section of "An act concerning wills" (4 Comp.Stat. p. 5860), and the complainant became seized of the land in fee, subject only to the widow's dower. The widow intermarried with the defendant, and, erroneously believing herself to be the owner of the above real estate, executed a last will and testament, in which she attempted to devise one-third of the same to the defendant and the remaining two-thirds to the complainant. Thereafter, the complainant's mother died, and the defendant, in 1906, was appointed the general guardian of the latter's person and estate. During the period following this appointment he filed four or five intermediate *Page 685 
accounts, and submitted to her when she became of age a final account, which was never filed in the office of the surrogate, but exhibited to her in the office of his attorney, where she accepted the same after a brief examination of it and its accompanying vouchers. The reason for this perilous practice will presently be made apparent.
The complainant became twenty-one years of age on the 6th or 7th day of November, 1921, and the final account was exhibited to her a little more than two months thereafter, on January 23d 1922. On the following day the deed, which is attacked in the bill, was drafted, and on January 25th, 1922, it was executed and acknowledged. It conveyed a little more than one-third of her entire estate, and the land conveyed was at that time worth $30,000. It was a voluntary donation, the complainant receiving nothing whatsoever in consideration thereof. After the deed had been signed by the complainant in the office of the defendant's attorney, she was escorted to the office of another member of the bar who bears a very high reputation both for integrity and professional skill, before whom, as a master in chancery, she acknowledged the instrument. His testimony is that he has no recollection of the transaction, and it is perfectly clear that nothing more was done in his presence or by him than the usual perfunctory explanation to the grantor of the contents of the deed and the taking of her acknowledgment.
There is no denial that the complainant as a child was nervous and delicate. In fact, she gave unmistakable evidence on the witness-stand of being highly nervous, if not actually neurotic. She was constantly under the care of physicians and unable to continue her scholastic education beyond the grammar grades, although possessed of an income of some $6,000 or $7,000 a year. It is true that she attended two schools conducted for business training upon the advice of her guardian, but before completing the course her delicate health necessitated a break in this education, so substantial that, when she resumed, it was at another school.
Upon the death of her mother the defendant placed her in the home of one of his sisters named Mrs. Griffin, where she *Page 686 
lived until the time of her marriage, and, in fact, for some time thereafter. While thus domiciled, there is no doubt that she was treated with kindness, care and attention, and that, so far as her health and moral training were concerned, she was well cared for. But it is also equally true that during all of that period she paid her way, dollar for dollar. So great a mass of proofs was submitted that it is impracticable, within any reasonable limit, to completely present it in this opinion. But it was clearly demonstrated that the complainant utterly relied upon the defendant and his sister up to and including the time of the conveyance under attack.
During the complainant's minority exceptions were filed by a next friend to the last intermediate account ever filed in the office of the surrogate, and many, if not all of them, were sustained, whereby it was made evident that the defendant had prayed allowances for a very substantial sum of money, upwards of over a thousand dollars, which the orphans court disallowed and surcharged him with. In this connection it is not without interest to say that a counsel fee of $150 was allowed in that court to the next friend, and in his final account, which was not to bear the scrutiny of an impartial officer or to be filed as a public record, this man charged his ward with the payment of that counsel fee, which he had been directed to pay himself because of his official misconduct. Another striking instance of the effort of the defendant and those associated with him to profit by his relation of trust was the purchase of a more or less expensive automobile, which was intended for their profit and convenience, rather than that of the ward. A letter was produced, written by some physician, recommending automobile driving for the complainant's physical benefit, and there was also produced a petition addressed to the orphans court for permission to purchase the same. This, however, was never filed, and no such order was ever granted. Nevertheless, the car was purchased and used as a family vehicle, and the judgment of the physician proved entirely wrong, because the complainant was found to be of too nervous a disposition and temperament to operate an automobile. Counsel for the defendant, *Page 687 
in answering the charges that full advantage had been taken of his opportunities by the guardian to profit at the expense of his ward, made the astounding argument that the legal allowances were not compensatory. If such a rule should be adopted by this court, it might as well submit and give up the struggle that it has made for centuries to compel fiduciaries to be faithful. So far as I remember, no attempt was made to explain the discrepancy in the testimony about the gift of $2,500 to Mrs. Griffin.
At the time the complainant executed the deed in question it will be recalled that she had, on the day before, examined her former guardian's final account and assented to the items therein displayed. Among them appeared regular payments of rent for the premises conveyed by the deed just mentioned, up to and including the month of November, 1921, during which she became twenty-one years of age. For December of that year and January of the year following the defendant had not charged himself with any rent, although he still continued to occupy the premises as a tenant and his ward continued to be the owner of the fee. This is especially damaging, in view of the fact that the defendant testified he had had no idea that the complainant intended to make him a gift of these premises, not only at the time the deed was executed, but not until a long period thereafter, when the deed was returned by the register of Hudson county to his attorney after it had been recorded. The defendant had been in the office where the deed was drawn on the day before its date, admittedly, and I am convinced was there at the time it was executed, although this he denies. It is one of the weaknesses of human nature that only an exceptional man can resist the temptation to be present personally and see the execution and fruition of a scheme long maturing and of great benefit to his fortunes. It is not difficult, when vitally interested, to remain quiescent even when things are running smoothly and all the auspices are good. I suppose it is the same infirmity that renders it so hard for an advocate to remain silent even when the court is arguing his case for him against his adversary. Of course, in line with his *Page 688 
defense that there had been no undue influence, he felt obliged to say that any such scheme was so far from his mind that he had, not only never taken the subject up with her, but he was totally unaware of the impending stroke of good fortune. He was at a loss, however, to explain why he ceased paying rent for premises which he occupied only as a tenant and never contemplated enjoying as the owner.
My understanding is that it is within the realm of possibility for a ward to contract with his guardian, or, in fact, to make a voluntary donation, either while the relation exists or shortly thereafter, although to sustain such a transaction has been said to be almost impossible. Pom. Eq. Jur. § 961. However, when such a voluntary gift is attacked by the ward, there is wisely thrown upon the party occupying, or who has occupied, the dominant position, the burden of proving that the other fully comprehended what he was doing, that it was without any undue influence, that no fraud or deception was practiced, or that any other unconscionable advantage taken by the one who is presumed to have been able to exercise some greater or less degree of influence by reason of the relation existing or that had existed.Idem. In short, such a gift as the one under consideration is regarded with the utmost suspicion, giving rise to a presumption that it is void, after the relationship is established, and that presumption continues until the defendant sustains the burden which the law casts upon him. Hall v. Otterson, 52 N.J. Eq. 522,
and cases cited. This the defendant has failed to do. When one considers the physical and mental condition of the complainant, her utter isolation from anyone interested in her by ties of blood, her absolute dependence through all the years of her weakness upon the defendant and his sister, the proved attempts of the defendant to improperly profit at her expense while he exercised dominion over her fortune, securing this donation so soon after she attained her majority, and his failure to pay any rent for the two months preceding the gift, and, in fact, from that time on, although he says that he did not know of her intended generosity or the accomplishment thereof until long after the gift was made, it *Page 689 
is unescapable that her bounty was not the result of her own uninfluenced wishes, but came entirely, as she says, from the germ of the idea that had been carefully, systematically and skillfully implanted in her mind. This girl was growing into maturity, an orphan who had almost never seen the mother who brought her into the world. It is common knowledge that as a girl grows up into young womanhood there is created in her mind a romantic and reverential tenderness for her mother, as she herself begins to bloom into womanhood. She appreciates and realizes the maternal character as no man can ever hope to. Under these circumstances, it seems to me that the instrument was at the defendant's hand and ready for his use that would make easy the persuasion of this young woman that the wishes of her dead mother with regard to the property in dispute should be carried out, and that there was a sacred duty upon her to effectuate them. I realize that in the case of a strong-minded and generous-hearted woman, under a debt of gratitude to a benefactor — this, in itself, would probably sufficiently impel her to make a gift such as the one under consideration. But it cannot be said that she is either of a strong intellect or possessed of an unusually generous disposition, and there has been nothing to indicate that the treatment she received as an infant would have been strongly influential in arousing a feeling of such generosity. Not even the letter, written under peculiar circumstances to her guardian's lawyer in the first part of 1924, in which she says that Mrs. Griffin had been more than a mother to her for eighteen years, could be considered such proof, because there is strong reason to believe that at that time she was actuated far more by a desire to injure her husband than anything else. Inasmuch as her husband and the defendant were then struggling for possession of her person, she naturally felt that anything she said or did which favored the latter and his sister would be injurious to the former. Her husband had at that time just secured a writ of habeas corpus out of the supreme court to take her away from the influence of the defendant. *Page 690 
In the defendant's behalf much has been made of the base character of the complainant husband. There can be no doubt of his mean character, rapacity, that he deliberately set out to catch an heiress, and has lived upon her fortune. Hour after hour he sat through the final hearing listening to his character being unmercifully displayed in all its ugliness, and, while he attended to the end, he did not offer himself as a witness to deny a single fact. From this it is apparently desired that I shall dispose of the property in dispute in such a manner as to render it impossible for him to ever enjoy any benefit flowing from it. This, of course, I cannot do. It is a question between his wife and the defendant. If she is successful, it will become a part of her separate estate, over which the law gives her husband no dominion. If she chooses to bestow it upon him by a valid gift or permits him to use it, or the rents, issues or profits thereof, then the answer is, as was said by a learned judge and text-writer: "Equity does not undertake to act as the guardian of mankind. It does not aid people who make foolish bargains." Nelson v. Betts' App., 21 Mo. 219.
In an attempt to overcome the legal presumption in this case, counsel argues that the cross-examination of the complainant disclosed that she was a woman of unusual firmness. With that it is impossible to agree. It is my firm belief that she is of a pliable disposition, or, as was not inaptly said, of one like putty. In fact, I am quite as firmly convinced that if she should again be thrown under the influence of the defendant he could rapidly turn her present hostility to him against the husband to whom she now cleaves. Counsel loses sight of the fact that her conduct and demeanor upon the stand was influenced by her knowledge that in the front row of witnesses' seats there sat that husband whom she was obliged to face at the close of each session of the hearing, and with whom she was obliged to return each night to their home. Her whole attitude on the stand indicated that she had keyed herself to go through with the part that she had assumed. While she exhibited a childish animosity, at times directed against the cross-examiner, I think it is fair to say *Page 691 
that there were hardly any admissions which he sought that she did not eventually make, and while I have great respect and admiration for his skill in that art of the advocate, I do not think he would have come off so well with a woman of ordinary intuition and mentality. He readily pierced her defenses, and, on many occasions, compelled her to discredit her own previous statements, but he did not break down the main elements of her testimony to the effect that her will had been influenced through her childhood days.
Another aspect of this case that has been stressed by complainant's counsel is that when she made the conveyance she did not have the advantage and benefit of what has become known in this state as independent advice. Slack v. Rees, 66 N.J. Eq. 447.
The lawyer who represented her guardian, in the attack upon the latter's fourth or fifth intermediate account, was the only person with whom she had an opportunity to discuss making the gift. He has testified that he, not only strongly advised her against the execution of the deed, but, in fact, compelled her to go home and deliberate on what he had said to her, and it was not until she had complied with this direction that he was eventually prevailed upon to prepare the indenture for her signature. I have great confidence in his word, and am without doubt that what he says is true, but I do not understand that this satisfies the doctrine in question. He was placed in a situation of great delicacy and embarrassment, and one that it would have been far wiser had he never assumed. He was dealing with a young woman whose mind had been worked upon with great artfulness, and who was pouring out to him what she conceived to be her own wishes instead of those that had been implanted in her mind by others for their gain. In addition to that, he must have been subconsciously influenced by reliance upon the integrity of the defendant, with whom he had associated for a long time in a relation of the highest confidence. Without in any way impugning his honesty of purpose, it can scarcely be said that conferring with him afforded her independent advice and "untrammeled consultation with some person competent under all thecircumstances" *Page 692 
(italics mine) to advise her. Guiditta v. Bonacci, 95 N.J. Eq. 147.
It may, perhaps, be said, and I think it was so advanced on the argument of this cause, that the rule expressed in Slack v.Rees, supra, does not apply unless the donor, by the transaction, strips himself of all, or substantially all, of his substances. It is true that, in the very recent case of In reFulper, 99 N.J. Eq. 293, it is said that if the subordinate retains property enough to prevent impoverishment the rule does not apply. Vice-Chancellor Green (in Hall v. Otterson, supra) said that it applied to all transactions "except in those involving mere trifling gifts." But whether or not the law has been in a state of flux since that time is of no moment in the case at bar. Having decided the main question, namely, undue influence, adversely to the defendant, it is of no moment whether the more refined rule is applicable or not.
The deed should be canceled and an account taken, and I will so advise.