The complainants filed bills of interpleader which involve funds on deposit in their banks. There are two claimants: one, the executors of the last will and testament of Antonina Nowacki Olewinski, and the other, Stephen Nowacki. The bank accounts were opened in June, 1934, by Antonina Nowacki Olewinski, who deposited and owned the funds therein. They constitute her entire estate. The claimant, Nowacki, alleges title to the accounts through the execution, by Antonina, of two written assignments (Exhibits D-1 and D-2), dated October 12th, 1937, and of two bank form signature cards (Exhibits D-10 and D-11), dated October 14th, 1937.
Exhibit D-1, in part reads:
"* * * I, Antonina Nowacki Olewinski, for and in consideration of the sum of One Dollar, to me in hand paid by Stephen Nowacki of Herkimer, N.Y.; and in consideration of the many kindly acts performed by him for me, during my lifetime, do hereby transfer, set over and convey to the said Stephen Nowacki, an undivided one half interest in all moneys to my credit in the Hackensack Trust Co., of Hackensack, N.J., being in Interest Account No. 44201, and also in all moneys to my credit in the Leonia Bank and Trust Co., of Leonia, N.J., being Interest Acct. No. 8544, said accounts from the date hereof to be joint tenancy accounts, the survivor to take all.
 * * * * * * *
"I further direct the said Hackensack Trust Co., at the request of my said attorney in fact, and also the Leonia Bank Trust Co., at the request of my said attorney in fact, said Stephen Nowacki, to transfer said accounts as herein directed, on their books, to the end that the accounts above referred to shall hereafter read, `Antonina Nowacki Olewinski and Stephen Nowacki, as joint tenants, the survivor to take all,' it being my intention that Stephen Nowacki shall have all of said moneys upon my death." *Page 567 
 Exhibit D-2, in part reads:
"* * * I, Antonina Nowacki Olewinski, for and in consideration of the sum of One Dollar, to me in hand paid, by Stephen Nowacki, of Herkimer, N.Y., and in consideration of the many kindly acts performed by him for me during my life time, do hereby transfer, set over, and convey to the said Stephen Nowacki, an undivided
interest in all moneys to my credit, in the Hackensack Trust of Hackensack, N.J., being an Interest Account No. 44201, and also in all moneys to my credit in the Leonia Bank Trust Co. of Leonia, N.J., being Interest Account No. 8544. Said account from date hereof to be joint tenancy accounts, the survivor to take all." (Italics mine.)
 * * * * * * *
"I further direct the said Hackensack Trust Co. at the request of my said Attorney in fact, and also the Leonia Bank Trust Co. at the request of my said Attorney in fact, said Stephen Nowacki, to transfer said accounts as herein directed, on their books, to the end that the accounts above referred to shall hereafter read, `Antonina Nowacki Olewinski and Stephen Nowacki, as joint tenants, the survivor to take all, it being my intention thatStephen Nowacki shall all of said money upon my death.'" (Italics mine.)
The claim of the executors is based on the provisions of the last will and testament of the decedent (Exhibit D-A 1), executed July 21st, 1934, and probated before the surrogate of Bergen county, New Jersey, on November 4th, 1937, which, in part provides as follows: Paragraph 2 requests that the funeral of the decedent shall cost not less than nine hundred dollars ($900); the third paragraph bequeaths $500 to the trustees of St. Joseph's Church in Hackensack, with an added provision that the income from that fund be used for the perpetual care of her burial plot; paragraph 4 bequeaths $4,000 to her brother in Poland; the tenth, eleventh, twelfth, thirteenth, fourteenth and fifteenth paragraphs provide bequests to a god-child of the decedent.
Antonina became ill on October 11th, 1937, at Nowacki's home in Herkimer, New York, and died there on October 21st, 1937, at the approximate age of seventy-one years. She had been residing with the Nowacki family continuously for about twenty months before her death. Previous to that time, and for many years, she had lived in Englewood, Bergen county, New Jersey. She had very little knowledge of the English language and spoke "very, very broken and very poor English." *Page 568 
The assignments, Exhibits D-1 and D-2, were executed during the decedent's last illness, one week prior to her death; and, at that time, Nowacki's son acted as interpreter between the decedent and the persons involved. The assignments were prepared by Nowacki's attorney, Francis J. Moore, of Herkimer, and he, as a notary, took the acknowledgments set forth thereon. The day following the preparation and execution of the assignments, or on October 13th, 1937, Nowacki traveled from his home in Herkimer to Hackensack, New Jersey, a distance of approximately two hundred miles, and presented to the Hackensack Trust Company the assignment, Exhibit D-1; and, immediately thereafter, on the same day, he offered to the Leonia Bank and Trust Company the assignment, Exhibit D-2. Both banks then refused to accept them for the reason that the acknowledgments on the assignments did not have annexed to them certificates of the clerk of Herkimer county, New York, evidencing the authority of the notary to take the acknowledgments. The banks also insisted that their written, or printed, forms creating joint accounts of depositors be used by Antonina for the proposed transfers of the accounts. Nowacki, thereupon, returned to Herkimer and located his attorney Moore and related to him the attitude of the banks. Moore, then, at about eight o'clock that same night, went to the home of the clerk of Herkimer county and persuaded him to proceed to the court house, unlock his office, and then attach a county clerk's certificate to the acknowledgments on the assignments showing Moore's notarial power and authority. The following day, October 14th, 1937, Nowacki returned to the two New Jersey banks and filed with them the assignments, Exhibits D-1 and D-2.
The executors contend, first, that the decedent's intention to make a gift was not established by evidence that is clear and convincing; second, if evidence of any intention to make a gift exists, that intention was to create a gift testamentary in its nature and is void because there was no compliance with the statute of wills; third, that the entire transaction, resulting in the execution of Exhibits D-1, D-2, D-10 and D-11, is void because: (a) the decedent reposed trust and confidence *Page 569 
in Nowacki, he having acquired a dominant position over her, and the instruments D-1 and D-2, if legally effective, impoverished the decedent; (b) the decedent did not have proper, competent, independent, disassociated legal advice.
Francis J. Moore, the attorney, testified that on the night the assignments were executed, which was sometime between the hours of ten and twelve o'clock, he was called to the Nowacki home, where the decedent was then ill. He further said (page 21, testimony):
"Q. Did she say anything to you about having any feeling at all that she was about to die? A. Yes. Q. What did she say to you? A. I asked her what was the trouble, and she pointed to her heart and she said, `doctor, say no good.'"
And, also: "I further felt it was something she wanted to do in expectation of death when I got the call from Doctor Graves, or when I talked to him."
Doctor Graves, who professionally attended the decedent on the night the assignments, Exhibits D-1 and D-2, were drawn, testified that the decedent was a very sick woman; that he "gave her so many hypodermics she didn't know what it was all about" (page 37, testimony); and that she said she would like to see a lawyer; and he suggested she be attended by a priest (page 44, testimony). The doctor telephoned Moore, the attorney, to call at the Nowacki home and consult with the decedent.
The testimony of the doctor and of Attorney Moore suggests the clear inference that the decedent was critically and dangerously ill — she died one week later. It is evident that there was feverish activity in the Nowacki home that night. The assignments were carelessly drawn — drawn imperfectly and lacking clarity. The incidents that transpired in the sick room, at the decedent's bedside that night, throws doubt upon her freedom of mind and action. The activities of all there present lead to the unassailable conclusion that the parties interested were engaged in a "race against death" to make Nowacki the victor and the beneficiary of a desperately sick and aged woman's entire estate. Certainly such conduct arouses the conscience, and requires careful scrutiny by the *Page 570 
court of the attitude, the motives, the results, and the benefits to the actors. Equity maintains a constant vigil to protect the affairs of the weak. A close study of all the facts and circumstances in the instant case affords no favorable consideration to the deportment of Nowacki. The transfers were effected in a critical period of the decedent's life — on her death-bed. The assignments leave no doubt that the decedent donor intended to transfer title in anticipation of her death. The last paragraphs of the assignments, Exhibits D-1 and D-2, so declare: "It being my intention that Stephen Nowacki shall have all of said moneys upon my death." The gifts so intended are therefore void because they fail to comply with the statute of wills. In Haydock v. Haydock's Ex'rs, 34 N.J. Eq. 570, the court said:
"In the present case, these gifts, while gifts inter vivos, were undoubtedly intended by the donee to operate as a testamentary disposition of the donor's property. It is clear that the physical condition of the donor was critical, and his days brief in number. * * * and that some disposition of his property, in view of his death, was requisite. For some reason, the will was never drawn, and it is transparent that the gifts were executed to fill the place of a will."
The case of Cutts v. Najdrowski, 121 N.J. Eq. 546;191 Atl. Rep. 867 (later reversed by the court of errors and appeals on other grounds, 123 N.J. Eq. 481; 198 Atl. Rep. 885), is further authority for the contention discussed under this point.Stevenson v. Earl, 65 N.J. Eq. 721; 55 Atl. Rep. 1091; Gordon
v. Toler, 83 N.J. Eq. 25; 89 Atl. Rep. 1020; McCullough v.Forrest, 84 N.J. Eq. 101; 92 Atl. Rep. 595; Hunt v. Naylor,84 N.J. Eq. 646; 95 Atl. Rep. 138; Johnson v. Savings Investmentand Trust Co., 110 N.J. Eq. 466; 160 Atl. Rep. 371; Dunn v.Houghton, 51 Atl. Rep. 71; Thatcher v. Trenton Trust Co.,119 N.J. Eq. 408; 182 Atl. Rep. 912.
It may be observed that the evidence shows that the decedent had implicit faith, trust and confidence in Nowacki. She so stated to Attorney Moore and to her nurse. Nowacki had knowledge of that feeling of the decedent for him. She *Page 571 
sought his advice about her affairs and her property. He took care of her ordinary, conventional needs. There is no doubt in my mind that the relationship that existed between Nowacki and the decedent was one of dependence, trust and confidence. I believe Nowacki imposed upon that relationship, and used it to his own advantage. Crowther v. Micucci, 122 N.J. Eq. 81;192 Atl. Rep. 439; affirmed, 123 N.J. Eq. 164; 196 Atl. Rep. 676. It was said in Hall v. Otterson, 52 N.J. Eq. 522 (at p. 528);28 Atl. Rep. 907:
"In all transactions between persons occupying relations, whether legal, natural or conventional in their origin, in which confidence is naturally inspired, is presumed, or in fact reasonably exists, the burden of proof is thrown upon the person in whom confidence is reposed and who has acquired an advantage, to show affirmatively, not only that no deception was practiced therein, no undue influence used, and that all was fair, open and voluntary, but that it was well understood."
The transfer of all the decedent's funds to joint accounts with Nowacki enabled Nowacki to withdraw all the moneys; as a joint owner, he would have that right. Such a withdrawal would unquestionably impoverish the decedent. That being the situation here, Nowacki, therefore, was confronted with the burden of establishing by clear and convincing evidence that the assignments were not the result of undue influence, and that the decedent had the benefit of competent, independent advice. That burden he failed to successfully carry. Croker v. Clegg,123 N.J. Eq. 332; 197 Atl. Rep. 13; Slack v. Rees, 66 N.J. Eq. 447;59 Atl. Rep. 466; Kelly v. Kelly, 107 N.J. Eq. 483;153 Atl. Rep. 384; Haydock v. Haydock, supra; Crowther v. Micucci,supra; In re Fulper, 99 N.J. Eq. 293; 132 Atl. Rep. 834; Peppler
v. Roffe, 122 N.J. Eq. 510; 194 Atl. Rep. 548; Matthews, Admx.,
v. Craven, 124 N.J. Eq. 455.
What advice, if any, did the decedent have before executing the assignments? None. Attorney Moore merely explained the contents of the assignments; he did not advise or counsel her. Certainly the explanation he gave cannot be termed *Page 572 
advice; it does not fall within the contemplation of the law governing the use of the term "independent advice." Melos v.Hagen, 99 N.J. Eq. 683; 133 Atl. Rep. 538; Mott v. Mott,49 N.J. Eq. 192; 22 Atl. Rep. 997; White v. White, 60 N.J. Eq. 104;45 Atl. Rep. 767; Hall v. Otterson, supra; Kelly v.Kelly, supra. Moore testified (page 26, testimony) that when he was preparing the assignments of the bank accounts, he received some instructions from Nowacki. Moore first met the decedent through Nowacki when Nowacki brought her to his (Moore's) office to effect a transfer of real estate from her to him (Nowacki).
It is to be noted that the decedent's knowledge of the English language was very limited, and that Nowacki's son, a favorite of the decedent, acted as her interpreter. The son's testimony gives no clear and convincing indication of the decedent's intention to make a gift nor does it appear that he made a clear interpretation. He testified (page 154, testimony), "when I got through with the whole affair, it was pretty hazy to me." He (the interpreter) told the decedent that Exhibits D-1 and D-2 were identical (page 156, testimony). A reading of the exhibits proves the contrary. They are not identical.
The provisions in the decedent's will point to the state of her mind at the time the will was made. Her considered plans, as expressed in her will, would not, and could not, be effected if the assignments (D-1 and D-2) were valid. Did the decedent apprehend such a situation when she executed the assignments? Was she, in effect, willing to abandon and cancel her testamentary provisions covering the cost of her funeral, the care of her burial plot, the bequest to her brother, c., in order that Nowacki would get all she possessed? I do not think so. To me, it does not seem logical or consistent.
Considering all the facts and circumstances, I shall advise orders denying the claims of the defendant, Nowacki, and sustaining the claims of the executors. *Page 573