SARAH B. ELKINTON, appellant,

v.

JOSIAH M. BRICK, respondent.

1. The presumption of the law is in favor of testamentary capacity, and those who insist upon the contrary have the burden of proof. They may shift that burden by showing that insanity existed prior to the making of the disputed paper. After such proof the proponents must show that the execution of the will was during a lucid interval.

2. To prove that the testator, about the time of the execution of a will, was addicted to the habitual use of intoxicating liquors to such an extent that he was occasionally drunk, is not sufficient to render it incumbent upon the proponents to show that, at the time the will was executed, he was free from incapacitating intoxication. The person who asserts such drunkenness must affirmatively show that it existed at the very time the will was made.

3. Influence, to be such as the law denominates undue, must destroy free agency and amount to moral or physical coercion.

4. Importunity which cannot be and is not resisted is undue influence. The mere suggestion to a testator that an indicated testamentary provision would be productive of justice between the natural objects of his bounty can hardly be said to amount to undue influence. An attempt to pursuade a testator to make testamentary provision is treading upon dangerous ground, and may exceed the bounds of that influence which is legitimate.

5. It is impossible to distinguish by a fixed rule between that which is within the bounds of legitimate influence and that which makes the influence undue. The effect of all acts must depend upon the relations between the parties to them and the character, strength and condition of each, and be determined by the application of sound sense to each given case.

6. The attestation clause of the witnesses to a will or codicil is *prima facie* evidence of the facts recited in it.

7. It is not necessary that a testator shall, in express terms, declare the instrument in process of execution to be his will. Another may speak for him. It is sufficient that enough is said or done, in the presence and with the knowledge of the testator, to make the witnesses understand distinctly that he desires them to know that the paper is his will and that they are to attest it.

On appeal from a decree of the orphans court of Salem county.

*Mr. M. P. Grey* and *Mr. S. H. Grey,* for the appellant.

Elkinton *v.* Brick.

*Mr. C. H. Sinnickson* and *Mr. W. E. Potter*, for the respondent.

THE ORDINARY.

This appeal is from a decree of the Salem orphans court, which admits to probate, with the last will of Charles Elkinton, a paper purporting to be a codicil to that will.

The will bears date on the 28th day of October, 1876, and the codicil on November 28th, 1879.

When the will was made the testator was about seventy years of age, and resided at the village of Pennsgrove, in Salem county. His wife was dead. The natural objects of his bounty were his four sons, all of whom were then living. By the will he divided his property into four equal parts. One of those parts he gave to his son George; another to the wife and children of his son Joseph; another to the wife and children of his son James, and the remaining part to the wife and children of his son Franklin.

He directed that each son's indebtedness to his estate should be deducted from the share which should come to that son, or to his wife and children. He had taken from each of his sons a bond, for moneys that had been advanced to him, and, of these bonds, that which was given by Franklin bore date on July 2d, 1872, and was to secure the payment of $6,607.33—a much larger sum than any of the other bonds secured. Franklin, however, when sworn as a witness, acknowledged that he gave the bond to his father, without complaint that it exceeded his just indebtedness. The principal and interest due upon this bond, and a small additional indebtedness of Franklin, will absorb the entire share that his wife and children will take under the father's will.

The real contention is, whether the share which is to go to Franklin's family shall pay the amount due upon this bond. In the appellant's behalf, it is claimed that the testator gave Franklin's bond to his wife, in 1878, and that the disputed codicil to the will, which expressly charges the bond against Franklin's share of the estate, must be rejected. On the other hand, it is contended that the bond was stolen from the testator, and that

the codicil was made to provide against the consequences of that theft, and is valid, and should be admitted to probate.

The validity of the codicil is the subject of the present inquiry. That instrument contains the following recital :

> "Whereas, since making my last will and testament, I have lost out of my possession a certain bond, bearing date sometime in the year 1871, for six thousand and six hundred dollars, and bearing interest at seven per cent. per annum, which I held against my son Franklin B. Elkinton, as evidence (in part) of his indebtedness to me, at that time,"

and directs that the amount of that bond, with the interest accrued thereon at the testator's death, be deducted from the share of the estate which, by the will, was bequeathed to Franklin's wife and children, and further charges against that share of the estate an additional indebtedness of $535 and interest.

The appellant, who is the wife of Franklin Elkinton, assails the codicil on three grounds : First. That Charles Elkinton did not possess testamentary capacity at the time he signed it. Second. That it was the product of undue influence, exercised by George Elkinton. Third. That Charles Elkinton did not, in the presence of two witnesses, declare it to be a codicil to his will.

The proofs fail to sustain the first insistment. At best, they establish that the testator was addicted to the habitual use of intoxicating liquors, about the period when the codicil was made; that he was occasionally drunk, and that, before he died, (in August, 1886), he was afflicted with softening of the brain, and became imbecile; but I am entirely satisfied, that when the codicil was made Mr. Elkinton possessed testamentary capacity.

The witnesses produced by the appellant to show mental incapacity are few, and are all subject to the criticism that their interest is with the appellant. Charles Elkinton is the appellant's son, and is accused of stealing from his grandfather the bond which the codicil is designed to re-establish ; Catharine Culin for eight years has been the appellant's servant at her residence in Philadelphia; Mrs. Vance, who resides at Wilmington, Delaware, is connected with the Elkinton family, and, by issues in this controversy, is put in an attitude of defence against the pro-

ponent's attack and of friendship for the appellant; Dresden McCarthy has had differences with George Elkinton, who is accused of having influenced or procured his father to make the codicil in dispute. They all testify to instances of absence of mental power in the testator during the fall and summer of 1879, but McCarthy qualifies his testimony by adding that he cannot say that the mental condition that he instanced was continuous.

On the other hand, the proponent produced a number of apparently disinterested witnesses who had been neighbors and friends of the testator, or so situated with reference to him that they had abundant opportunities to judge of his mental condition. William Walker was a witness to the codicil, and is a barber in Pennsgrove. He states that in the summer and fall of 1879 the testator frequently came to his barber-shop and there engaged in conversation without exhibiting any mental impairment. Dr. Johnson, a physician, also saw the testator frequently in the summer and fall of that year, but failed to notice indications of mental unsoundness. He states that, in his opinion, the testator was sound in mind in that year. He says that the testator would drink, and that, while under the influence of liquor, he would act and talk strangely, but that when he was sober his mind was sound. He says that this continued until the year 1881, when his mind began to fail, but that, until the year 1883, Mr. Elkinton was not imbecile. The orphans court attached importance to the testimony of this witness, and I think justly, for he seems to have had full opportunity for observation and to have intelligently taken advantage of it. He appears to be entirely disinterested in the event of this contest, and to be entitled to full credence. Charles Leap was the manager of the Pitman Meadow Bank Company, in which Mr. Elkinton was interested. He states that between November 10th and December 4th, 1879, while working on a meadow-bank, he dealt with the testator and advised with him about the construction of a sluice, and was then impressed that the testator was of sound mind. James Casey, who was a farmer-tenant of the testator, mentions dealings that he had with Mr. Elkinton in the summer and fall of 1879, which

indicate that the testator then had a good memory and capacity for business. Besides these witnesses, others, more or less interested in the event of this suit, testify to the soundness of the testator's mind.

The presumption of the law is in favor of testamentary capacity, and those who insist on the contrary have the burden of proof. They may shift the burden by showing that insanity existed prior to the making of the disputed paper. After such proof, the proponents must show that the execution of the will was during a lucid interval. *Turner* v. *Cheeseman, 2 McCart. 243; Trumbull* v. *Gibbons, 2 Zab. 117; Whitenack* v. *Stryker, 1 Gr. Ch. 8; Sloan* v. *Maxwell, 2 Gr. Ch. 563; Day* v. *Day, 2 Gr. Ch. 549; Turnure* v. *Turnure, 8 Stew. Eq. 437.* The burden of proof as to want of testamentary capacity, in this case, was upon the appellant. I think that she has failed to bear it, and that the proponent, by his proofs, has fully established that capacity which the law, in the absence of proof, presumes. To prove that the testator, about the time of the execution of the codicil, was addicted to the habitual use of intoxicating liquors to such an extent that he was occasionally drunk, was not sufficient to render it incumbent upon the proponent to show that, at the time the codicil was executed, he was free from incapacitating intoxication. *Andress* v. *Weller, 2 Gr. Ch. 604.* The person who asserts such drunkenness must affirmatively show that it existed at the very time the will was made. *Peck* v. *Cary, 27 N. Y. 9, 17; Andress* v. *Weller, 2 Gr. Ch. 604.*

The appellant's second insistment is, that the codicil was the product of undue influence, exercised by George Elkinton over his father. George was the youngest son, and remained near his father while his brothers were at a distance; Franklin resided at Philadelphia, where he was engaged in business; James lived at Bridgeton, and worked upon a steamboat plying between that place and Philadelphia, and Joseph, although maintaining a home for his family at Pennsgrove, was a fisherman in the waters of North Carolina, and, consequently, almost always away from home. The father resided with Joseph's family, with whom Jacob Nixon, a witness for the respondent, also lived. Nixon

was employed by Joseph as a clerk, in a small store that Joseph maintained in the basement of his dwelling. Nixon says that in September or October, 1879, he had occasion to be in Charles Elkinton's room, in Joseph's house; that Elkinton had been drinking, and had some papers, out of his iron safe, spread upon his bed; that he requested Nixon to put those papers in the safe, and that he, Nixon, did as he was directed, first, however, noticing that they consisted of four bonds, including one endorsed with the name of Franklin Elkinton. He also states that, on the following day, Franklin Elkinton's wife and his son Charles, then about sixteen years old, and Louisa Vance, who is a daughter of the testator's sister, visited the house; that when they came the testator was under the influence of liquor; that the grandson Charles induced his grandfather to take him to the grandfather's room, from which, after three-quarters of an hour, he passed out through the basement; that as he went out he exhibited to Nixon the corner of a paper, in his pocket, and said: "I have got uncle George, now," adding something, that the witness does not fully state, about a bond, and that he, Nixon, then sent a messenger to George Elkinton to apprise him of that which had thus transpired. George Elkinton swears that he saw his brother Franklin's bond, in the possession of his father, in September, 1879, about a month before he was notified by Nixon of the conduct of his nephew, above referred to. He also swears that the day after that notification he asked his father if the grandson had been with him the day before, and, upon the father's replying in the affirmative, asked if he had given away Franklin's bond, and, upon that question being answered in the negative, told him what Nixon had seen and heard; that thereupon the testator appeared to be surprised, and a search for the bond was instituted without success; that then the witness urged his father to procure a warrant for the arrest of the grandson, but could not prevail upon him to do so; that he then told the testator that "something must be done," to which the testator emphatically assented. He states that upon several occasions afterwards he tried to induce his father to have the grandson Charles arrested, but without success, and that he sought to

bring about an interview between his brother Franklin and his
father, and to that end wrote to his brother that their father
wished to see him on business, and, obtaining no reply, on the
17th of October, 1879, wrote again.   This letter was produced
by the appellant and is as follows:

"F. B. ELKINTON:

"*Dear Bro.*—I wrote you this week that father would like to see you on busi-
ness; would like you to come down Thursday; would say that he would like
you to come down on Wednesday of next week, as he wishes to see you con-
cerning your bond of $6,600.   It is missing.   If you do not come he proposes
adding a codicil to his will, setting forth amount of bond, with accrued interest,
together with other moneys loaned you to the amount of or near $2,000, inde-
pendent of the $3,000 mortgage on the hotel property.   He says it must be
attended to.                 You affectionate brother,
                                        "G. H. ELKINTON, *for Charles Elkinton.*"

To this letter, on the 18th of the same month, Franklin El-
kinton replied as follows :

"DEAR SIR.—I pen you.   If you have any business with me you know
where you can find me.   You and father come up any date next week.
                                                  "F. B. ELKINTON."

The witness testifies that, as he could not prevail upon his
father to have the grandson arrested, and as Franklin would not
come to Pennsgrove, he suggested to his father that a codicil be
made to the father's will, and that eventually his father decided
to make a codicil.   He further states that after this determina-
tion he and his father went to the office of James Hannah, a jus-
tice of the peace, taking the father's will with them, and that
when they arrived the father told Hannah that he would like
him to draw a codicil to his will ; that the father said the codicil
was to be " respecting the missing bond ; " that Hannah inquired
as to the date and the amount of the bond ; that the father could
not remember them, and called upon the witness to assist him ; that
the witness could not remember, but stated the date and amount
as nearly as he could recall them, and then, leaving the office, went
home.   He says that when he left, Mr. Hannah was making notes
with a lead-pencil.   The next day Hannah met the witness and told

him something, (which, on account of objection, was not disclosed), and, in consequence of it, the witness notified his father to go to Hannah's office. They went there together and found the codicil prepared, and then, at the suggestion of Mr. Hannah, the witness called in Mr. Walker. He did not return to the office with Walker or until after the paper had been executed. When he next went in he heard his father directing Hannah to keep the will and codicil, and saying that he would like to have them deposited in the Woodstown bank, together with the remaining evidences of indebtedness which his sons had given him. The witness also states that his father told Hannah that he was becoming old, and that his memory was so poor that he was hardly fit for business, and heard Hannah suggest that the witness should be made his agent, under a power of attorney, and the testator say that he had been thinking of it. He states that the result was that Hannah drew up a power of attorney which the father executed. Both codicil and power of attorney were executed on the same day. The witness says that he knew nothing of the $535 mentioned in the codicil; that that sum, he presumes, was a matter of his father's figuring.

It appears that James Hannah died before Charles Elkinton, and that after Mr. Elkinton's death the proponent found at the Woodstown bank an envelope endorsed "Deliver unto the undersigned, James Hannah. 3, 5, 1880, E. R. Bullock," containing the will and codicil of Charles Elkinton, the bonds of James, Joseph and George Elkinton, and a note of Franklin Elkinton for $500, dated in December, 1877.

E. R. Bullock had been president of the Woodstown bank, but was then dead.

William Walker, the surviving witness to the codicil, testified that he remembers that George Elkinton asked him to go to Hannah's office, and accompanied him to the office door, and there left him; that he went in, and saw Mr. Hannah and Charles Elkinton together. The memory of this witness is indistinct as to what took place in the office. He recalls the fact that questions were asked, and that Mr. Hannah said that the paper was a codicil or a will; that this was said in the presence

11

of the testator, who then asked where George was, and if the
door was shut, or if it was locked—the witness cannot recall
which—and that he and Hannah and Mr. Elkinton signed the
codicil in the presence of each other, but he cannot give the
conversation accurately or entirely. He says that he cannot re-
member it. This is all the evidence bearing upon the immedi-
ate execution of the codicil.

At the trial, before the orphans court, the appellant pro-
duced a bond which had been made by Franklin Elkinton to
his father. It bears date on July 2d, 1872, and is conditioned
for the payment of $6,607.33, with lawful interest, two years
after its date. Louisa Vance testified that during a visit to
Charles Elkinton, in the summer of 1878, he called her into his
room and handed her this bond, and said : "Louisa, I want you
to count the interest and principal on this bond, and tell me what
it will amount to, in case I live ten years longer." Upon her
replying "$11,000" or "$12,000," he said : "Well, well; there
will not be one dollar left for Sally ; she is a good and industrious
woman ; I want her to have a share with the rest of my children."
He then put the bond away. She further testifies that, in the fall
of the same year, he visited her at her residence in Wilmington,
directly across the Delaware river from Pennsgrove, and after
transacting some business with her, produced the same bond and
said : "Louisa, I want you to give that bond to Sally ; I have
too much money charged against Frank, and I would never have
had that amount charged against him if it had not been for
George." He also said that he was sorry he had mentioned the
claims against his children in his will. The witness further
says that subsequently she gave the bond to the appellant, and
that the appellant returned it to her for safe keeping, and that
she then hid it in a picture-frame until after Mr. Elkinton died.
This witness and the appellant both deny that they visited Mr.
Elkinton, with Franklin's son, in the fall of 1879, and that son
himself contradicts the witness Nixon in every particular.

It is impossible to reconcile the testimony of the witnesses as
to the disappearance of the bond of Franklin. If Mrs. Vance
is believed, it was impossible for Nixon to have seen the bond in

September of 1879, and for George Elkinton to have seen it a month later; and George Elkinton either falsified when he said that his father was surprised at the discovery that the bond was missing, and when he emphatically asserted that "something must be done," or the old man cleverly acted a deceitful part. If George Elkinton and Nixon tell the truth, then the story of Mrs. Vance must be false. The orphans court credited the story of Mrs. Vance. I will not undertake to determine where the truth lies. I am satisfied that George Elkinton discovered the absence of Franklin's bond in October, 1879, and that he at once apprehended that its disappearance would be productive of injustice to himself and his brothers, in that Franklin's share in the father's estate would be subject to but trifling deduction, although the advances to him had almost doubled those to any other of the brothers, while each of the other brother's shares would be charged with that brother's entire indebtedness. It is plain, from George's letter to his brother Franklin, that he held that brother accountable for the disappearance of the bond, and looked to him to replace it. While he made no direct accusation, he used language which does not negative his present assertion that he believed that the bond had been stolen. Whether the testimony, then, be true or false, I think it is clear that George Elkinton believed that the bond had been stolen by Franklin's son.

The position of the testator is not so easily defined. If Mrs. Vance told the truth, it is evident that he lacked courage to tell George that he had given Franklin's wife the bond, fearing, perhaps, his indignation at an act so inequitable to the other sons. In such a situation he, of course, could not consent to the arrest of his grandson, for such arrest would speedily bring to light the act he sought to conceal. His only escape from the difficulty was to make a codicil to his will and restore his testamentary disposition to an equitable basis, and postpone the discovery of his gift of the bond until after his death. In this view of the case he displayed mental acumen in adopting a course that would preserve his secret, and strength of will in resisting the importunity of his son to arrest his grandson. His assurance to his son

that "something must be done" was indicative of a mind as yet undetermined upon the course to be pursued, but resolved to right the wrong in some way, which, upon reflection, would seem to be the best. He would not arrest his grandson, but he would do something to make reparation. When George suggested the codicil, its advantages for his purpose became apparent to him.

If, on the other hand, the testimony of Mrs. Vance, as to the gift of the bond, was false, his surprise, when the loss of the bond was discovered, was genuine, and his resistance of the importunity to arrest his grandson was because of the harshness of such a course and the consequent alienation of a portion of his family. He had intimated an anxiety lest there might be difficulty in the family after his death—this unfortunate gift seemed to make it more probable—and he cast about him to know what to do to avoid it. George was so connected with the family, and interested, that he could not be taken into the full confidence of the testator's thoughts, and consequently, to George's importunity, he said, "I will not arrest my grandson, but will do something." At the suggestion of a codicil, a course was opened to him. In such an instrument he could recite that the bond had been lost, and thus make no accusation that would lead to future bitterness; and after such recital he could make specific provision for the charge of the amount of the bond against Franklin's share in his estate, and thus do justice. In this position, also, he exhibits a strong will, and, with it, a sagacious judgment.

In one or the other of these dilemmas he went to Mr. Hannah, the master of his own mind and will. George accompanied him, but remained only long enough to give his remembrance of the date and amount of the bond. At the execution of the codicil, on the following day, George was excluded from Mr. Hannah's office, the testator evincing a desire that he should not be there and that the door should be closed. Even the witness Walker was told that he had no concern with the contents of the paper that he was called to attest. This secrecy is corroborative of my conclusion that the codicil was the testator's free act, when it is remembered that the feelings that George had exhibited were

Elkinton v. Brick.

vindictive.  His letter to Franklin indicates that he would have charged his brother with $2,000 in addition to the bond.  It was not the father's purpose to be so severe.  He had determined not only to describe the bond as lost, but to be exactly just in his pecuniary charges against Franklin.  He would charge the amount of the bond, a note of $500 which was found among his papers after his death, and the small sum of $35.  I think it is manifest that these charges were below George's expectation, and that for that reason, among possible others, he was excluded from participation in the preparation of the codicil.  When that instrument was completed, the testator gave it, and his will, and the bonds of James, Joseph and George, and the note of Franklin, to Mr. Hannah for safe keeping, and expressed a desire that they should be placed in the Woodstown bank.  He evidently had lost confidence in his own ability to keep them, because he had been victimized by one of his family while he was intoxicated, or in a moment of weakness had been inequitable in his bounty, and felt the necessity of having another custodian for those important papers.  The blunder he had made so destroyed his self-confidence that he also sought the advice of Mr. Hannah as to the future management of his property, and was advised to make George his attorney.  I am satisfied that George's will was not substituted for that of his father when the codicil was made.  There are not sufficient *indicia* of undue influence in the case to throw the burden of proving the testator's free agency upon the proponent.  Whatever explanation is needed to satisfy the mind, is credibly given in the testimony of George Elkinton.  His suggestions in reference to the codicil did not exceed the limit of that which was legitimate, and did not amount to that which the law denominates undue influence.  Undue influence must be such influence as destroys free agency and amounts to moral or physical coercion.  Importunity which cannot be resisted, or which is yielded to for the sake of peace, amounts to coercion and the destruction of free agency (*Trumbull* v. *Gibbons, 2 Zab. 117*), but it can hardly be that the mere suggestion to a testator that an indicated testamentary provision would be productive of justice between the natural objects of his bounty,

will destroy the freedom of his will. It has been held that even persuasion, which is beyond the bounds of mere suggestion, may be of such a character as not to amount to undue influence. *Trumbull* v. *Gibbons, supra; Hughes* v. *Murtha, 5 Stew. Eq. 288.* To attempt to persuade a testator, however, is treading upon dangerous ground, for the result may be that he will be led to assent to that which, of his own free will, he would not have assented to. It is impossible to distinguish, by a fixed rule, between acts which are within the bounds of legitimate influence and acts which make the influence undue. Similar acts may be trifling and of no importance in the case of one person, and overmastering in the case of another. Their effect must depend upon the relations between the parties, and the character, strength and condition of each (*Rusling* v. *Rusling, 9 Stew. Eq. 603 ; Dale* v. *Dale, 11 Stew. Eq. 274; Waddington* v. *Buzby, 16 Stew. Eq. 154*), and must be determined by the application of sound sense to the facts of each given case.

I do not think that the proofs in the case before me would justify my holding that the disputed codicil was the result of an undue influence exercised over the testator.

The third ground of objection to the paper offered for probate relates to the formality of its execution.

It is insisted that it has not been shown that the testator declared the disputed paper to be a codicil to his last will in the presence of the witnesses to it. The attestation clause of the codicil is in the following language :

"Signed, published and declared by the said Charles Elkinton as a codicil to his last will and testament, in the presence of us, who were present at the same time and subscribed our names as witnesses in his presence."

The statute (*Rev. p. 1247 § 22*) requires that a will (1) shall be in writing; (2) shall be signed by the testator; (3) that his signature shall be made by the testator or the making thereof be acknowledged by him; and (4) that such writing shall be declared to be his last will in the presence of two witnesses, present at the same time, who shall subscribe their names thereto in the presence of the testator.

It will be noted that the codicil and the recitals in the attestation clause of the witnesses show compliance with all these requisites. The attestation clause is *prima facie* evidence of all the facts stated in it. *Ayres* v. *Ayres, 16 Stew. Eq. 565,* and the cases there cited. Nothing in the evidence rebuts this *prima facie* case. On the contrary, the witness Walker recollects that Mr. Hannah said in the presence of Mr. Elkinton that the paper they were about to sign was a will or a codicil, and that he asked him to sign "Mr. Elkinton's codicil." I am satisfied that the testator understood and acquiesced in that which Mr. Hannah said. Aside, then, from the probative force of the attestation clause, the testimony establishes a sufficient declaration of the codicil. It is not necessary that the testator should, in express terms, declare the instrument in process of execution to be his will. Another may speak for him. It is a sufficient compliance with the statute when enough is said or done, in the presence and with the knowledge of the testator, to give the witnesses to understand distinctly that the testator desires them to know that the paper is his will and that they are to attest it. *Mundy* v. *Mundy, 2 McCart. 290; Turnure* v. *Turnure, 8 Stew. Eq. 437.*

I will affirm the decree of the orphans court.