JOHN G. PEPPLER and HENRY W. PEPPLER, executors under the last will and testament of Barbara Peppler, deceased, and JOHN G. PEPPLER and HENRY W. PEPPLER, individually, complainants-respondents,

*v.*

EMELINE ROFFE and JOHN C. ROFFE, defendants-appellants.

[Argued May 21st, 1937—Decided October 26th, 1937.]

*Mr. Joseph Steiner* (*Mr. Israel B. Greene,* of counsel), for the appellants.

*Messrs. Vanderbach & Vanderbach* (*Mr. Lewis W. Vanderbach,* of counsel), for the respondents.

The opinion of the court was delivered by

HEHER, J.

We concur in the view of the learned vice-chancellor that defendant Emeline Roffe has not established her claim of title to the disputed shares of the capital stock of the Highwood Realty and Building Company. The essentials of a valid gift *inter vivos* were not proven. The evidence does not

warrant the finding of either a donative intent or the donor's delivery of the subject-matter, accompanied by a complete surrender of ownership and dominion, requisite to a gift of this character. The stock was not transferred on the corporate books. It was voted by the asserted donor (the claimant's mother), in her own right, from the date of the assignment of the stock to Emeline, March 4th, 1926, until the former's death on August 16th, 1934. Emeline attested the corporate minutes narrating that her mother had so voted the stock; and it does not now lie in her mouth to deny their verity, in the absence of fraud or deception. And the requirement of clear and convincing evidence to establish such a claim is not met. As to this, it suffices to point out that Emeline did not, in the lifetime of her mother, affirm ownership of the stock or exercise the voting powers incident thereto. The proofs are convincing that the certificate and assignment were lodged in the family safe by the mother, to remain there under her control, and that their unauthorized abstraction and appropriation were the purposes of the raid thereon concededly made by Emeline. She acknowledged that her object in so doing was to secure, for her mother's "protection"—a wholly gratuitous undertaking, as evidenced by the mother's institution of this suit for their recovery—all "unrecorded" documents. The certificate of stock and the assignment thereof fall into this category. As stated, the transfer had not been recorded on the corporate books. Moreover, the deceased made affidavit in this cause indicative in its averments of an intent to retain title to these securities. Of this more hereafter.

But the evidence tends to show the same infirmity in the claimed gift *inter vivos* to the deceased's son, John G. Peppler, of the mortgages in the aggregate principal sum of $14,400. While the assignments were acknowledged and recorded in the appropriate public record offices, the deceased subsequent thereto, on March 15th, 1934, in the affidavit referred to (it was annexed to the first amended bill of complaint together with an affidavit made by John, joined as a party complainant, relating to Emeline's possession of the

securities), stated that she kept in the "family vault," located in the homestead occupied by the mother and three children, "certificates of corporate stock, bank stocks, bank accounts, bank books, mortgages, certificates of deposit and other holdings, which" she was then "unable to enumerate," "most of" which "securities were endorsed in blank or provision was made for the assignment or transfer" thereof "by virtue of power of attorney, or otherwise;" and that she had not "transferred or assigned any of said holdings to any person, but * * * had executed said blank assignment, said power of attorney and otherwise placed them in a transferable position, in order that" her "estate might be quickly settled in case of" her "death, or in case they could be sold at" her "direction."

Furthermore, while the assignments of the mortgages, drafted by John, the assignee, recited a total consideration of $14,400 to the assignor "in hand paid" by the assignee, there was in fact no consideration whatever for the transfer, and on the final hearing the assignee asserted and sought to prove a gift of the property. But no explanation was offered for the recital in the assignments of a consideration equivalent to the full principal sum of the mortgages. John and his brother, Henry, who also participated in the transaction, were singularly reticent on the witness stand as regards the motive and the circumstances attending the execution and claimed delivery of the assignments. It is also significant that the notaries who took the mother's acknowledgments were not called as witnesses. The facts and circumstances, when viewed as a whole, are plainly demonstrative of the lack of a delivery essential to a gift *inter vivos*.

The learned vice-chancellor points out that the mortgage assignments were made after the discovery of the abstraction of the securities from the family safe by Emeline, and shortly after the institution of this suit for their recovery; and this he considered sufficient to sustain the inference that consequent resentment motivated the transfer. But such an inference is negatived also by the provisions of the mother's will, executed the day after the institution of this suit to recover

the securities so taken by Emeline, bequeathing and devising to her and her two brothers the entire estate in equal shares, without any allotment to Henry of securities or other property in an equal amount. Rather, it suggests that John sought to offset the advantage which he conceived Emeline had thus secured. And this leads to another and dispositive feature of the case.

While the deceased was a woman of means, and the mortgages so assigned constituted but a small part of her estate, there is cast upon John, by reason of his dominance in the relation of trust and confidence which he bore to his mother, the burden of establishing affirmatively that the confidence so reposed was not abused, and that the transaction was wholly free from deception and undue influence, and was fair, open, voluntary and fully understood and characterized throughout by the utmost good faith.

At the time in question the deceased was seventy-nine years of age. For six months prior thereto she had been afflicted with cancer which had then, to John's knowledge, been diagnosed as incurable, and resulted in her death six months thereafter. John was then fifty-three years of age. He was a man of wide business experience. He had been vice-president of a trust company, and had studied law, although not admitted to practice. Concededly, he was the family counsellor. He was the draftsman of his mother's wills, deeds of conveyance, contracts and other documents requiring technical skill. As pointed out, he prepared and recorded the assignments of the mortgages. He organized corporations for the transaction of the family business and the holding of family property. He managed these corporations and conducted their meetings, keeping the minutes, and so forth. The deceased and her three children lived together in the family homestead, acquired in 1897. He and his mother held joint title to capital stock and bank accounts. All her valuables, securities and papers of importance were kept in the household safe maintained for the use of the family; and for access thereto, she was dependent upon John and her son, Henry. John acknowledged that "mother would never do a

thing like that [appending her signature to an assignment of a stock certificate] unless I or my brother were present."

The specific formula for the resolution of this question is laid down in *Haydock* v. *Haydock's Ex'rs, 34 N. J. Eq. 570*. Where, as here, the parties, by reason of a relationship of trust and confidence, do not deal on terms of equality, there arises out of a transaction such as this a rebuttable presumption that the dominant party has acquired an unfair advantage. In that case Mr. Justice Reed declared it to be the settled rule that, "where a person enfeebled in mind by disease or old age is so placed as to be likely to be subjected to the influence of another, and makes a voluntary disposition of property in favor of that person, the courts require proof of the fact that the donor understood the nature of the act, and that it was not done through the influence of the donee. *Huguenin* v. *Baseley, 2 L. C. in Eq. (4th Am. ed.) notes pp. 1183-1185, American notes pp. 1192-1194*. The presumption against the validity of the gift is not limited to those instances where the relation of parent and child, guardian and ward or husband and wife, exists but in every instance where the relation between donor and donee is one in which the latter has acquired a dominant position." See, also, *Post* v. *Hagan, 71 N. J. Eq. 234, 242; Slack* v. *Rees, 66 N. J. Eq. 447; Hall* v. *Otterson, 52 N. J. Eq. 522; affirmed, 53 N. J. Eq. 695; Mott* v. *Mott, 49 N. J. Eq. 192; Parker's Adm'x* v. *Parker's Adm'r, 45 N. J. Eq. 224; Corrigan* v. *Pironi, 48 N. J. Eq. 607; Coffey* v. *Sullivan, 63 N. J. Eq. 296; Vass* v. *Warner, 92 N. J. Eq. 294*. This rule of evidence is grounded in "the principle of correcting abuses of confidence"—peculiarly the subject of equitable cognizance. *Billage* v. *Southee, 9 Hare 439*.

In invoking the general rule applied in *Bankers Trust Co.* v. *Bank of Rockville Center Trust Co., 114 N. J. Eq. 391*, that the law will raise the presumption of a gift by a father to his son where it will not be indulged in like transactions between strangers, the learned vice-chancellor fell into error. That principle is applicable only when the parent is not the dependent of the child.. Here, due to age and the ravages of

an incurable disease, and a natural reliance over a period of years upon the son's advice in matters of business and property as well as in family affairs generally, the normal relation between the parent and the child had been reversed, with dominancy in the son; and in these circumstances the presumption of controlling influence by the dominant party obtains. As said in *Haydock* v. *Haydock, supra,* "the parent, by age, may come under the sway of his children." And in *Mott* v. *Mott, supra,* Vice-Chancellor Green said: "With reference to transactions between parent and child, the law presumes that the influence of the parent over his child, during the tender years of infancy, is so controlling that it regards transfers from the child to the parent, on arriving at majority, or immediately thereafter, as having been made under the influence of over-weening confidence. As the child matures and acquires experience and independence the presumption weakens and at last ceases. As the parent, however, advances in years, the condition of dependence may be reversed by the hand of time. If life draws to a close with a failing intelligence and enfeebled frame, the parent naturally looks with confidence to a son or daughter for advice and protection. The parent becomes the child, 'with the same dependence, over-weening confidence and implicit acquiescence' which had made the other, in infancy, the willing instrument of the parent's desires. *Highberger* v. *Stiffler, 21 Md. 338; Martin* v. *Martin, 1 Heisk. 644, 653; Brice* v. *Brice, 5 Barb. 533; Comstock* v. *Comstock, 57 Barb. 453; Whelan* v. *Whelan, 3 Cow. 537; 2 White & T. Lead. Cas. (4th ed.) 1206.* If, under such circumstances, a son obtains a conveyance from a parent, this court will not permit it to stand unless such son establishes by abundant proof that the contract was not only free, but fair, and made with the utmost good faith." See, also, *Slack* v. *Rees, supra.*

And the fact that the donor did not thereby strip herself of all, or practically all, of her property does not, as maintained by respondent, render this principle inapposite. Where that is the case, the law, for the protection of the donor, raises the presumption (if the requisite confidential relation-

ship subsists) that he did not fully understand and appreciate the irrevocable character of the act nor foresee its legal consequences to himself, and, even though the gift was not the product of undue influence, there is cast upon the donee the duty of showing that the donor had the benefit of timely competent and independent advice. *Slack* v. *Rees, supra; Post* v. *Hagan, supra.* The *ratio decidendi* of these cases is that, in the absence of advice of this character, there arises from the apparent improvidence of the transaction the conclusive presumption that the donor did not understand and appreciate the act and its personal consequences. As said by Chief-Justice Gummere, in *Slack* v. *Rees, supra,* the purpose of this rule "is not so much to afford protection to the donor against the consequences of undue influence exercised over him by the donee as it is to afford him protection against the consequences of voluntary action on his part, induced by the existence of the relationship between them, the effect of which, upon his own interests, he may only partially understand or appreciate." See, also, *Soper* v. *Cisco, 85 N. J. Eq. 165, 173; Coffey* v. *Sullivan, supra; Siebold* v. *Zieboldt; 93 N. J. Eq. 327; affirmed, Ibid. 500; Grimminger* v. *Alderton, 85 N. J. Eq. 425; affirmed, 86 N. J. Eq. 247.*

It is evident from what has been said that the donee has not borne the burden thus cast upon him of overcoming the presumption of the invalidity of the assignments of the mortgages; and the decree, to the extent that it adjudicates this issue, must therefore be reversed.

The decree is accordingly affirmed in part and reversed in part, and the cause is remanded with direction to enter a decree in conformity with this opinion.

*For affirmance in part and reversal in part*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, LLOYD, CASE, BODINE, DONGES, HEHER, PERSKIE, DEAR, WELLS, WOLFSKEIL, RAFFERTY, JJ. 13.