18 N.J. Super. 600 (1952)
87 A.2d 748
AMEDIA GIACOBBI, PLAINTIFF,
v.
AUGUST ANSELMI AND ANGELINA ANSELMI, HIS WIFE, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided March 14, 1952.
*604 Mr. Ivins N. Lavine (Mr. Constantine Donato appearing), attorney for the plaintiff.
Mr. Charles I. Levine, attorney for the defendants.
*605 GOLDMANN, J.S.C.
Plaintiff brings this action to set aside a deed dated April 17, 1943, and duly recorded in the Mercer County Clerk's Office five days later, conveying her home and the adjoining double lot at 441 Bert Avenue, Trenton, to her daughter, Leina Anselmi, and Leina's husband, the defendant August Anselmi. Leina died February 21, 1945; her husband married defendant Angelina Anselmi in April, 1947. The complaint, filed May 1, 1951, alleges that the consideration for the conveyance was the promise of Leina and August Anselmi to provide for the plaintiff for the rest of her life, and that the conveyance was made "without the benefit of independent advice to the plaintiff and solely as a result of undue influence practiced upon plaintiff" by the Anselmis.
By way of a second count the plaintiff further alleges that on or about December 1, 1950, the defendants paid off an existing mortgage lien on which there remained a balance of $2,200, and placed a new mortgage of $5,250, part of whose proceeds were used to install a heating system in the Bert Avenue house and the remainder appropriated to defendants' own purposes. She demands judgment on this count directing defendants to account for the proceeds of the new mortgage loan and for that portion of the proceeds not spent to improve the property.
An extended statement of the facts surrounding the conveyance and of the circumstances attending the Giacobbi-Anselmi family relationship before and after that event is necessary for the proper application of the legal principles involved.
The plaintiff was 75 years old at the time of the conveyance. The property covered by the deed was all she had, except for a few home furnishings. She and her husband Mose Giacobbi had acquired the property in 1924, paying $6,500 for the house and $1,000 for the adjoining double lot. Plaintiff has resided in the house ever since.
The Giacobbis had four children: Leina, who died in 1945; Sylvia, who died in 1939; Aspromante (referred to *606 throughout the testimony as "Oscar"), who is 51, married and has been living in a home of his own since 1935, and Frank, 42 years of age, married and established in his own home since 1936 or 1937. Leina and her husband, the defendant, went to live with her parents in 1918 and continued there for a number of years until they moved into a rented home of their own. In 1938 the Anselmis and their four children moved back into the Giacobbi home on Bert Avenue, then occupied by only the plaintiff, her husband Mose and her unmarried daughter Sylvia. Mose Giacobbi was unemployed. He had been receiving old age assistance from the Mercer County Welfare Board under a reimbursement agreement since November, 1935; these payments continued to the end of November, 1941, at which time $860 was due the county. Plaintiff received similar relief from December 1, 1938, to the end of November, 1941, and payments made to her under the reimbursement agreement totalled $435. Mercer County thus had a lien of $1,295 against the Giacobbi property, reduced to $1,265 by a payment of $30 made on account by son Aspromante in November, 1942, apparently to obtain a release of lien against certain lots that had been given him by his parents.
At the time the Anselmis moved in with the Giacobbis there was a Home Owners Loan Corporation reduction-type mortgage against the Bert Avenue property, executed by plaintiff and her husband in October, 1934, and in the principal sum of $3,586.03. Monthly payments of principal and interest were to be $28.35. Interest only was paid from May, 1935, through 1937; toward the end of 1937 $120 was paid toward interest then in arrears and a single payment made on principal. Regular installment payments of principal and interest were resumed in 1938, at about the time the Anselmis moved into the Giacobbi home. Taxes being in arrears, the property was twice sold for taxes; the Home Owners Loan Corporation made tax advances to clear off the tax certificates. Failure by the Giacobbis to pay installments of principal during the depression, and these advances *607 against taxes account for the fact that on April 17, 1943, when plaintiff conveyed the premises to the Anselmis, the HOLC mortgage had increased to $3,698.76. There was, in addition, the county's lien for $1,265. Total liens against the property were therefore in excess of $4,960.
Mose Giacobbi died April 13, 1942, and plaintiff, as the surviving tenant by the entirety, became the sole owner of the property in question. The general warranty deed she gave the Anselmis recited the usual consideration of "one dollar and other good and valuable considerations." The conveyance, however, was made subject to the HOLC mortgage encumbrance, stated to be in the sum of $3,586, which the grantees expressly assumed and agreed to pay and satisfy as part of the consideration. The Home Owners Loan Corporation carried this mortgage account in the names of Amedia and Leina Anselmi from 1943 through 1945, and after 1945 in the name of August Anselmi only. The mortgage was assigned to the Howard Savings Institution of Newark on May 5, 1950, when the principal had been reduced to $2,343.93. This mortgage was cancelled of record in February, 1951, after it had been replaced by a new mortgage in the increased amount of $5,250, executed by the defendants to the Howard Savings Institution.
At the time of her conveyance in April, 1943, plaintiff was in good physical and mental condition, except for a diabetic condition which required medical attention and a special diet. She was active about the house and garden, interested in what was going on about her and in world affairs generally, alert, bright and of good memory. She got along very well with daughter Leina and her family; the household was an harmonious one, without family friction or tension. Plaintiff testified that Leina and her family ran their affairs and she ran hers. When questions arose involving the family as a whole or some special problem troubled her, she would consult Leina. All the testimony pointed to the fact that plaintiff looked to Leina for advice and guidance; Leina was the head of the household. In plaintiff's words, Leina knew *608 better what to do because she spoke English. Leina paid the bills and attended generally to the family affairs. Although the mother constantly consulted Leina, there is nothing in the evidence to show that Leina ever dictated what she was to do, or forced her to act against her own will. In fact, whatever testimony there was on this aspect of the family situation, was to the contrary.
Plaintiff's two sons, Aspromante and Frank, visited their mother regularly. Their custom was to give the mother small sums or food. It would appear that after 1945, when Leina died, they gave her $5 a week on a fairly regular basis and Aspromante brought her vegetables or a chicken from his place in the suburbs.
The defendant son-in-law took up the mortgage payments from the time he moved into the Bert Avenue home in 1938. After his wife Leina died there was a family-fund arrangement with weekly contributions of $20 each from the defendant and his daughters Doris (now Ferriola) and Florence (now Nagy). Mortgage payments, fuel, repairs, and the Anselmi family's food and other household necessities were paid out of this fund. This arrangement continued until defendant remarried and moved into his own home in 1948. After he left his daughters managed the household and met its needs. Mortgage payments were met with his funds or out of money paid by one daughter or the other as a variety of "rent." Leina took care of her mother's needs while she lived; after Leina's death in 1945 plaintiff received no direct help from her son-in-law. She had her own quarters and the run of the house, but she attended her own personal wants and the two sons supplied whatever funds she needed for special foods, insulin and medical attention. At no time did she request help of the defendant or his daughters. In short, she led a satisfied, somewhat independent existence. The sons apparently were also satisfied with the household arrangement and made no demand upon defendant that he pay in whole or in part for plaintiff's personal needs. There is nothing to indicate that they even suggested such a course *609 to him. Defendant took care of the upkeep and repair of the house, fuel, mortgage payments (as indicated) and, as long as he lived at Bert Avenue, for his share of the food.
The idea of conveying the property to Leina was first suggested by plaintiff herself in April, 1941. As plaintiff relates it, her son Aspromante had built a house in which there was a room set aside and ready for her, but she told Leina that this would not be convenient because of her need for medical treatments. Instead, she proposed that she would give Leina the house and Leina would, in return, take care of her as long as she lived. Plaintiff testified several times that it was she who proposed the conveyance and not Leina, and that defendant was not present during their conversations. Finally, she had Leina get in touch with Joseph R. Petrino, a local realtor in the Italian community, and he eventually came out to Bert Avenue. Plaintiff spoke to him in the presence of Leina and said that she was going to convey the property to the Anselmis on condition that they would take care of her. Petrino asked her if she knew what she was doing  the house would not be hers any more. She said she did. Plaintiff alleges that Petrino offered no further advice, but left and in a few days came back and had her sign the deed. She says that she fully understood what she did; Petrino explained in Italian that she was conveying the house to Leina and August on condition that they take care of her, and this was also made clear to the grantees. She claims that although Petrino told her that she could leave her property to Leina and her husband, there was no mention made of a will. Nothing was said about including a clause in the deed expressly providing for the promised support and maintenance, nor of a clause reserving to plaintiff the right to revoke the conveyance. Plaintiff further testified that there was no explanation made of what would happen should Leina die. Plaintiff at no time requested the services of a lawyer, nor was the need for such services mentioned.
Petrino testified that he had known plaintiff for many years. In March, 1943, Leina Anselmi met him and said that *610 plaintiff wanted to see him. He called at the house; Leina was present and the conversation was in Italian. Plaintiff told Petrino she wanted to convey the property to her daughter and son-in-law and inquired if her sons could interfere. He told her they could not and then asked, in turn, if what she was doing was her own act or whether someone was trying to get her to do it. She said that she herself wanted to do it, explaining that she had no income whatsoever and could not meet the carrying charges of the house. It was Petrino's opinion that it would be best for her to give the property to Leina and her husband jointly. It was possible to leave the property to them by will, but Petrino said that he could not prepare such an instrument. He advised plaintiff that if there were a conveyance there should be a separate agreement that plaintiff could remain in the house for life.
Petrino went on to testify that he prepared the deed and an agreement whereby the Anselmis were to support the plaintiff for life. He took these instruments to the Bert Avenue home, where he met plaintiff, Leina and her husband. They conversed in Italian and Petrino explained to plaintiff that if she signed the deed she would have no more to do with the property. He again inquired if Leina or her husband had compelled plaintiff to make the conveyance and was assured that they had not. Petrino claims that he then produced a support agreement, explained it, and that the three of them signed.
The complaint, as already noted, alleges an oral agreement to support as consideration for the conveyance, and the answer denies such agreement. The pretrial order states that the defendant August Anselmi claims the consideration for the conveyance was love and affection and the assumption of the mortgage, and that insofar as he knows or recollects, no promise was made to support the plaintiff for life. However, he stood ready and willing to support her upon request. The only testimony as to a written support agreement was that given by Petrino. He claims that the agreement was prepared in an original and two copies; that he gave the *611 original to the plaintiff and a copy to Leina, and placed the second copy in a file of its own in his office; that one of plaintiff's sons borrowed this file, which also contained a copy of the deed and his bill for services. Petrino alleges that he spent a great deal of time going through his files and could find no trace of these papers.
In August, 1951, Petrino gave plaintiff's attorney a sworn statement in which he said:
"Before the deed was signed by Mrs. Giacobbi I spoke to her in Italian language and I says to her and repeated it more than once, when you put your name and sign the deed you do not own this property no more than I do, your daughter and son-in-law own this property. And I asked her if she can't understand me I want her to tell me. She stated that she understood me. It was explained also before the deed was signed that August Anselmi and his wife, Lena, were to take care of Mrs. Giacobbi for the rest of her life and to maintain her, feed her, cloth her, take care of her medical bills and to house her for the rest of her life like we do in the Italian custom. I asked all of them if they understood what I mean. Then August asked me a question with reference to the maintenance, and in my reply I state to all of them so that they could all understand that if she gives the deed to you and your wife naturally Mrs. Giacobbi is entitled to her maintenance for her life. August agreed upon it and his wife also agreed upon it and Mrs. Giacobbi agreed upon it. After they all agreed upon it then Mrs. Giacobbi signed the deed in my presence and I took her acknowledgement. Full explanation was made to Mrs. Giacobbi and to her daughter and son-in-law and after she signed the deed I also asked her again if she did that voluntarily and she said yes."
Petrino explained that at the time he made this statement he did not remember the whole story. However, as he searched through his office files night after night the details gradually came back to him. Neither the plaintiff nor the defendant, the only others present at the time the deed was executed, testified to any written agreement. Such an agreement cannot be established on so limited and unsatisfactory a body of testimony as this. The court finds there was no written agreement to support the plaintiff for life.
When Petrino was asked on cross-examination whether he knew what a power of revocation in a deed was, he said he did not. In reply to further questions, he testified that he *612 had told plaintiff she could make a will, but she rejected the suggestion. He did not insert a provision about support in the deed because  as he claims he told plaintiff  such a record in the County Clerk's Office might defeat plaintiff's receiving old age assistance in the future.
It is clear from the testimony that defendant August Anselmi had nothing whatsoever to do with the conveyance now under attack. His only connection with the matter was his presence at the time the deed was executed. He testified that he was perfectly willing then, as he is now, to have the plaintiff remain at 441 Bert Avenue as long as she lives, and to support her. He claims that there has never been any complaint on the part of anyone, including the plaintiff, about his failure to support her. This statement finds corroboration in the rest of the testimony. It was not until 1950, when plaintiff came out of the hospital after an operation, that the question of contributing to plaintiff's needs first arose. It was then that plaintiff's sons, Aspromante and Frank, visited defendant at his home and, after inquiring as to whether the Bert Avenue house had a lien on it (the new and increased mortgage was apparently in their minds), asked if he would help pay plaintiff's hospital bill. They pointed out that he had the house and everything. He said he would help, but testifies that they never spoke to him again about the bill.
Defendant also testified as to the circumstances attending the recasting of the mortgage in 1950. One of the daughters had complained about the inadequate hot-air heating system at the Bert Avenue home. It was suggested that defendants might take out a loan for a new heater, but this proposal was rejected. The plaintiff then suggested that they borrow on a mortgage. Eventually they obtained the new mortgage from the Howard Savings Institution. The new heating system and certain other repairs were paid for out of the new monies.
Plaintiff's counsel argues that the conveyance must be set aside because of fraud and undue influence. There is *613 no evidence whatsoever of fraud. Undue influence, in the sense of the destruction of plaintiff's free agency and amounting to moral, physical or mental coercion (Elkinton v. Brick, 44 N.J. Eq. 154, at p. 165 (Prerog. 1888); In re Raynolds, 132 N.J. Eq. 141, at p. 149 (Prerog. 1942); Gellert v. Livingston, 5 N.J. 65, at p. 73 (1950)), is absent from this case. Full consideration of the circumstances surrounding the parties and the household arrangement at plaintiff's home establishes that the conveyance to Leina and August Anselmi was made on plaintiff's own motion and in the exercise of a free agency and uncoerced will.
We turn, then, to the charge that plaintiff executed the deed without the benefit of independent advice. The frame of reference within which this issue must be resolved is found in the long line of reported cases beginning with Haydock v. Haydock's Ex'rs., 34 N.J. Eq. 570 (E. & A. 1881) and continuing through the familiar sequence that includes such landmarks as Slack v. Rees, 66 N.J. Eq. 447 (E. & A. 1904); Post v. Hagan, 71 N.J. Eq. 234 (E. & A. 1907); Soper v. Cisco, 85 N.J. Eq. 165 (E. & A. 1915); In re Fulper, 99 N.J. Eq. 293 (Prerog. 1926), a valuable analysis of the then existing cases by Vice-Ordinary Buchanan; Peppler v. Roffe, 122 N.J. Eq. 510 (E. & A. 1937); and, of more recent date, Seylaz v. Bennett, 5 N.J. 168 (1950).
Drawing inspiration from the language of his opinion in Mott v. Mott, 49 N.J. Eq. 192, at p. 198 (Ch. 1891), and the authorities cited therein, Vice-Chancellor Green in the later case of Hall v. Otterson, 52 N.J. Eq. 522 (Ch. 1894) stated the basic rule to be (at p. 528):
"In all transactions between persons occupying relations, whether legal, natural or conventional in their origin, in which confidence is naturally inspired, is presumed, or in fact reasonably exists, the burden of proof is thrown upon the person in whom the confidence is reposed and who has acquired an advantage, to show affirmatively, not only that no deception was practiced therein, no undue influence used, and that all was fair, open and voluntary, but that it was well understood." *614 The language was adopted by the Court of Errors and Appeals, Otterson v. Hall, 53 N.J. Eq. 695 (E. & A. 1895), and expressly reiterated by it in Slack v. Rees, 66 N.J. Eq. 447 (at p. 449).
Although most of the cases invoking the rule are those where the transfers sought to be set aside are gifts, the rule by its very terms applies to "all transactions" where the dominant person in whom confidence was reposed acquired an advantage. Consideration is not a conclusive factor, as Vice-Chancellor Buchanan pointed out in In re Fulper, 99 N.J. Eq. 293:
"Proof of consideration for the transfer (if it existed) is at best only one element of the proof which the defendant is called upon to make under the rule. * * *" (P. 303.)
"* * * The real basis of these decisions, it is conceived, must necessarily be the principle that the proof of verbal promises as consideration for * * * a transfer, is not per se sufficient to establish the validity of the transfer; there must be always proof that the transaction was thoroughly understood by the transferor." (P. 306.)
The factor of independent advice has been the basis of decision in many of the leading cases. It is strongly urged here as the reason for setting aside the conveyance. The Court of Errors and Appeals in Haydock v. Haydock's Ex'rs., 34 N.J. Eq. 570, first stated the independent advice rule (at p. 575): "Where parties hold positions in which one is more or less dependent upon the other, courts of equity hold that the weaker party must be protected, and they set aside his gifts if he had not proper advice independently of the other." The same court, in Post v. Hagan, 71 N.J. Eq. 234, at pp. 242-3, pointed to its opinion in Slack v. Rees, above, decided only three years before, as limiting the rule of independent advice to cases where the transfer stripped the transferor of all or practically all of his property. This limitation has been followed since; its latest expression may be found in Seylaz v. Bennett, 5 N.J. 168, where the Supreme Court said (at p. 173):
*615 "When a person under the influence of and dependent upon another makes an improvident gift to the other stripping himself of virtually all his assets, a presumption of undue influence will arise from the facts and the gift will be declared invalid unless the donor has had the benefit of competent and disinterested counsel and it is shown he fully understood and intended the consequences of his act. Slack v. Rees, 66 N.J. Eq. 447 (E. & A. 1903); Post v. Hagan, 71 N.J. Eq. 234 (E. & A. 1906); Colgan v. Allen, 110 N.J. Eq. 451 (E. & A. 1932); Gross v. Lieber, 112 N.J. Eq. 570 (Ch. 1933); Croker v. Clegg, 123 N.J. Eq. 332 (E. & A. 1937); Oswald v. Seidler, 136 N.J. Eq. 443 (E. & A. 1945); Vanderbach v. Vollinger, 1 N.J. 481 (1949)."
The application of the rule is "inexorable" whenever apparent improvidence calls it into play. Reeves v. White, 84 N.J. Eq. 661, at p. 665 (Ch. 1915); Kelly v. Kelly, 107 N.J. Eq. 483, at p. 486 (Ch. 1931).
The purpose of the rule is "not so much to afford protection to the donor against the consequences of undue influence exercised over him by the donee, as it is to afford him protection against the consequences of voluntary action on his part, induced by the existence of the relationship between them, the effect of which upon his own interests he may only partially understand or appreciate." Slack v. Rees, 66 N.J. Eq. 447, at p. 449; Peppler v. Roffe, 122 N.J. Eq. 510, at p. 517; Collum v. Deane, 6 N.J. Super. 243, at p. 246 (App. Div. 1950).
Proper independent advice has been defined as meaning that "the donor had the preliminary benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform him correctly as to its legal effect, but who was furthermore so disassociated from the interests of the donee as to be in a position to advise with the donor impartially and confidently as to the consequences to himself of his proposed benefaction." Post v. Hagan, 71 N.J. Eq. 234, at p. 243. All the cases stress the necessary competent and independent quality of the advice sought or given.
The burden is upon the donee of showing by clear and convincing proof that the donee had the benefit of competent *616 and disinterested counsel and that the gift was the voluntary and intelligent act of the donor. Soper v. Cisco, 85 N.J. Eq. 165, at p. 174; Peppler v. Roffe, 122 N.J. Eq. 510, at pp. 516-7; Foster v. Medela, 9 N.J. Super. 195, at pp. 201-2 (App. Div. 1950); Seylaz v. Bennett, 5 N.J. 168, at p. 173.
As to the existence of the dominant confidential relationship required to bring into play the principle of the cited cases, the burden of proof is, of course, on the plaintiff who seeks to set aside the transfer. In re Fulper, 99 N.J. Eq. 293, at p. 313; Wolf v. Palisades Trust and Guaranty Co., 121 N.J. Eq. 385, at p. 389 (Ch. 1937). The Fulper case noted the difficulty of giving exact definition or delimitation of the relationship (at p. 314):
"The relationship includes not only all cases of technical, legal, fiduciary relationship, such as guardian and ward, principal and agent, trustee and cestui que trust, but also all cases where trust and confidence actually exist. It comprehends, as is said in Cowee v. Cornell, 75 N.Y. 91 (quoted in Mott v. Mott, supra, and in other cases in this state), all cases where `the relations between the parties appear to be of such a character as to render it certain that they do not deal on terms of equality, but that either on the one side from superior knowledge of the matter derived from a fiduciary relation, or from over-mastering influence; or on the other from weakness, dependence or trust justifiably reposed, unfair advantage is rendered probable.' It exists, as is said, in Slack v. Rees, supra, when the parties occupy `relations, whether legal, natural or conventional in their origin, in which confidence is naturally inspired, or, in fact, reasonably exists'; `where the parties hold positions in which one is more or less dependent on the other.'
Among the confidential relationships natural in their origin, are, of course, those of parent and child."
And further, as to the circumstances under which a child is considered the dominant party and the parent the dependent one, "no hard and fast rule can be laid down. The conclusion must be drawn in each case from the particular circumstances there existing." (P. 315.) Mental weakness in the parent is not a necessary factor.
Plaintiff has established that a confidential relation existed between her and her late daughter, Leina, in which Leina was the dominant member. Although plaintiff suffered *617 from no mental or physical infirmity, except for her diabetic condition, and was active, alert and somewhat independent, she did repose trust and confidence in her daughter. Leina was her confidante and advisor. She turned to her for the handling of her small affairs and the solution of problems as they presented themselves. Leina was, in fact, the vital center of the Giacobbi-Anselmi household.
Does the verbal promise to support plaintiff for life save this case from the operation of the rule as to independent advice, plaintiff having given away practically all she owned? The answer must be in the negative. Mott v. Mott, above; Walsh v. Harkey, 69 A. 726 (Ch. 1908); Siebold v. Zieboldt, 93 N.J. Eq. 327 (Ch. 1921), affirmed Ibid. 500 (E. & A. 1922); In re Fulper and Kelly v. Kelly, above.
This being so, the burden of proof was on Leina's husband, the defendant, to show that plaintiff had the benefit of competent and independent advice at the time of the conveyance. He failed to sustain that burden. Petrino, the realtor who was called in at plaintiff's request and who prepared the deed and saw to its execution, was not an attorney. He was not trained in the law. His role was a very limited one. As we have seen, he inquired whether plaintiff was not under another's compulsion in making the conveyance and whether she knew what she was doing  the house would no longer be hers. At the time the deed was executed he made clear to the parties that the Anselmis were to care for plaintiff for the rest of her life in consideration of the conveyance. He made passing mention of the possibility of a will, but the possibility was not explored nor its practical advantages explained.
Plaintiff was not told that it was important under the decisions that the promise of support be expressed in the instrument of transfer. Mott v. Mott, In re Fulper, above. Cf. Soper v. Cisco, above. There was no mention made of the fact that she might reserve a power of revocation or a life estate in the deed itself. Slack v. Rees, Kelly v. Kelly, above; Vanderbach v. Vollinger, 1 N.J. 481 (1949). It cannot be *618 said, in the significant language of the cases, that the transaction was "well understood" by the plaintiff. There is no proof that she realized that she might not in the future be able to enforce the verbal promise of support if the daughter and her husband should deny it, or both of them die. No one brought home to her the fact that she might, under unfavoring circumstances, have to depend on the charity of others for the rest of her life.
Whatever information was imparted to plaintiff at the time of the conveyance did not, therefore, meet the standard of advice fixed in cases of this kind. Reeves v. White, Kelly v. Kelly, above (real estate agents as advisors); Slack v. Rees, Post v. Hagan, Vanderbach v. Vollinger, above; Collum v. Deane, 6 N.J. Super. 243 (App. Div. 1950) (attorneys as advisors). Cf. Seylaz v. Bennett, above.
But having said all this, was the transfer, considered in its real aspect, truly "improvident"? The leading cases are bottomed on improvidence. It has already been shown that the time plaintiff executed the deed there was due and owing under the HOLC mortgage the sum of $3,698.76. The Giacobbis had been unable to carry the mortgage during the latter years of the depression; they had, in fact, been on old age relief. The defendant son-in-law had had to take up the burden of payments in 1938. There was also the county's claim of $1,265. Total liens on April 17, 1943, exceeded $4,960. The uncontroverted testimony of defendant's real estate expert, based upon contemporary sales in the area of the Giacobbi home and his own general knowledge of property values, was that the house and lot in question were worth $3,700 as of the date of the deed. Therefore, what plaintiff did, in fact, was to convey away a liability rather than an asset. The property had a minus value. This being so, the rule of independent advice would appear to have no application.
However, there is another and stronger reason why the conveyance should not now be set aside. More than eight years passed before the plaintiff took any step to rescind the *619 transaction. It is important to consider her situation during the intervening period. Her mental and physical vigor did not appreciably decline, at least to the point where she could no longer realize what she had done and take positive action to correct it. The conveyance was not kept hidden from those best able to advise her  her two grown sons who lived not very far away. She was free to see and talk to them when she chose; the testimony is that they were with her weekly or oftener. They certainly knew, or should have known, of the conveyance  a natural one for plaintiff to have made.
During these eight years the defendant son-in-law paid fuel and repair bills. Having assumed the mortgage, he saw to it that taxes, interest and principal payments were met. The mortgage itself was reduced by more than $1,350 before it was paid off and a mortgage in the sum of $5,250 executed in its stead. Plaintiff's liability under the original mortgage was thus wiped out, and the defendant and his wife became directly obligated under a new bond and mortgage. It is to be noted that defendants have thus radically changed their position. The defendant has been making the $57.95 monthly installment payments under this new mortgage since the beginning of 1951. From its proceeds he paid for a new heating system in the Bert Avenue property where, incidentally, he has not lived since 1948. This improvement cost him $1,050. He also had some linoleum laid, the cost being $85.
Plaintiff's delay, in such circumstances, without adequate excuse, is a bar to relief. The principle that great delay is a good bar in equity was stated in McCartin v. Traphagen's Adm'r., 43 N.J. Eq. 323 (Ch. 1887), affirmed 45 N.J. Eq. 265 (E. & A. 1889), where Vice-Chancellor Van Fleet said (43 N.J. Eq. at p. 338):
"Courts of equity have, from the earliest times, upon general principles of their own, even where there was no analogous statutable bar, refused relief to stale demands. More than one hundred years ago Lord Camden said: `A court of equity, which is never active in *620 relief against conscience, or the public convenience, has always refused its aid to stale demands, where the party has slept upon his rights, and acquiesced for a great length of time. Nothing can call forth the activity of a court of equity but conscience, good faith and reasonable diligence. Where these are wanting, the court is passive and does nothing. Laches and neglect are always discountenanced, and therefore from the beginning of this jurisdiction there was always a limitation to suits in equity.' Smith v. Clay, 2 Amb. 645, reported in a note to Deloraine v. Brown, 3 Brown, Ch. 640. The wisdom of this principle, both as a rule of justice and a regulation for the benefit of the public welfare, is so obvious that it has been universally adopted."
Lapse of time alone may be deemed sufficient ground to withhold equitable relief. Equity requires diligence; the old maxim runs: Vigilantibus et non dormientibus aequitas subvenit. Lutjen v. Lutjen, 64 N.J. Eq. 773, at p. 781 (E. & A. 1902); Lang v. Hexter, 137 N.J. Eq. 100, at p. 104 (Ch. 1945). The court in Condit v. Bigalow, 64 N.J. Eq. 504, at p. 515, stated the proposition in this way:
"If the jurisdiction is for the application of remedies purely equitable, such as specific performance, cancellation of instruments and the like, the period of delay which will be fatal does not depend upon the statute of limitations, but will be considered and determined with reference mainly to the circumstances and effect of the delay in the particular case, and the suit may be dismissed for delay less than the period fixed by the statute limiting the pursuit of legal remedies. The general equitable rule applicable to this class of cases is that which requires vigilance in the prosecution of rights."
Cf. Soper v. Cisco, 85 N.J. Eq. 165, at pp. 174-5.
It was not until the close of 1950 that any reference to the conveyance was made. It came, significantly, not from the plaintiff, but from her sons. It was when they approached their brother-in-law about helping with the hospital bill incurred for plaintiff's operation, that they charged that he had gotten everything. There was a suggestion in the testimony that early in 1951 defendant sent a real estate agent to the Bert Avenue property, preparatory to offering the property for sale. The defendant denied that he did so. There is nothing to show that the property was, in fact, *621 ever offered for sale or shown to inquiring purchasers. It was not long after that the complaint was filed.
The court observed the plaintiff on the stand, as well as her son Aspromante who testified in her behalf. (Counsel stated that the testimony of Frank, the other son, would have been cumulative.) The conviction will not down that, like the two children of the complainant in Soper v. Cisco, the sons inspired this suit, and that plaintiff acted at their instigation. One wonders whether the action would have been instituted without their inspiration, or if property values had not almost doubled since 1943.
There remains defendant August Anselmi's obligation to support the plaintiff during her natural life, the court being convinced that there was an oral agreement to do so at the time the deed was executed. In his answer, this defendant declares that he "stands ready and willing to provide support for the plaintiff as and when requested to do so out of love and affection for her and because she is the mother of his first wife and the grandmother of his children." He testified that he was perfectly willing then and he is now to have the plaintiff live at 441 Bert Avenue for the rest of her life, and to support her. Equity requires that plaintiff, at her option, may continue to live in the premises as long as she desires. Equity also requires that, at her option, provision for her prompt and adequate support during her natural life shall be secured to her in this proceeding. Soper v. Cisco, 85 N.J. Eq. 165, at p. 176.
Judgment for defendants. The court will retain jurisdiction over the cause for the purpose of making such further orders as may be necessary to enforce the oral agreement in accordance with the preceding paragraph, and for such further relief as may be necessary or appropriate.